[No. A127555. First Dist., Div. Two. Apr. 8, 2011.]

CENTER FOR BIOLOGICAL DIVERSITY, Plaintiff and Respondent, v. CALIFORNIA FISH AND GAME COMMISSION et al., Defendants and Appellants.

130

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Kathleen Kenealy and Mary Hackenbracht, Assistant Attorneys General, John Davidson, William N. Jenkins, Daniel S. Harris and Michael M. Edson, Deputy Attorneys General, for Defendants and Appellants.

Earthjustice, Deborah S. Reames and Gregory C. Loarie for Plaintiff and Respondent.

OPINION

**RICHMAN, J.**—Last year, this court determined that Code of Civil Procedure section 1021.5 (section 1021.5) would not support an award of attorney fees for a remand to an administrative agency to reconsider a previously decided matter, when the remand was for a perceived procedural defect and resulted in no demonstrable substantive change in the agency's position. We held that when the remand produces nothing more than an "augmented explanation" of the agency's decision, the plaintiff there did not meet the statutory requirements of being "a successful party" which had initiated litigation that resulted in enforcement of an important public right and a significant benefit to the public. We therefore reversed an award of $138,250. (*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330, 363–369 [108 Cal.Rptr.3d 40] (*Karuk*).)

Here, we are confronted with a situation where the administrative agency was ordered to reconsider a matter because it *might possibly* have applied an incorrect standard of review. The agency reconsidered the matter and reiterated its earlier decision. Notwithstanding that the agency's reiteration was not shown to be legally erroneous, the trial court, not having the benefit of our *Karuk* decision, made a fee award under section 1021.5 of almost $258,000. We independently review the record, conclude that *Karuk* governs, and reverse.

## BACKGROUND

A concise statement of this dispute is set out in the pleading that started this litigation:

"This lawsuit concerns the American pika, a remarkable mammal related to rabbits and hares that is at serious risk due to global warming. [The] Center for Biological Diversity (the 'Center') challenges the refusal of [the] California Fish and Game Commission (the 'Commission') to designate the pika as a candidate for possible protection under the California Endangered Species Act ('CESA'). (Fish & G. Code §§ 2050–2115.5.) [¶] . . . [¶]

"Of the 36 American pika subspecies that inhabit North America, five can be found in the mountains of eastern California. On August 21, 2007, the Center petitioned the Commission to protect California's pika under CESA by listing them as 'threatened' due to global warming. Alternatively, the Center asked the Commission to list California's five pika subspecies as either 'threatened' or 'endangered.'

"CESA sets forth a two-step process whereby the Commission must evaluate whether a species should be listed as threatened or endangered. In the first step, the Commission determines whether the listing petition, when considered together with other information in the Commission's possession, provides sufficient information to indicate that listing *may* be warranted. (Fish & G. Code § 2074.2.) If this first hurdle is cleared, the Commission designates the species as a 'candidate' for listing and the Department of Fish and Game (the 'Department') begins a comprehensive year-long review of the species' status.[1] (Fish & G. Code § 2074.6.) Only after the Department completes its scientific review does the Commission decide whether the species indeed warrants listing as threatened or endangered. (Fish & G. Code § 2075.5.) [¶] . . . [T]he Commission concluded on April 10, 2008 that the Center's petition does not provide sufficient information to indicate that listing the pika may be warranted. The Commission adopted written findings with that decision on June 27, 2008.

"The Commission prejudicially abused its discretion in rejecting the Center's petition to list California's pika under CESA[,] . . . misconstrued fundamentally CESA's listing process, and . . . ignored and misrepresented substantial information indicating that listing may be warranted. The Center therefore asks this Court to issue a writ of mandate setting aside the Commission's rejection of the Center's petition and directing the Commission to designate California's pika as candidates for listing under CESA."

Tracking the grounds for issuance of a writ of administrative mandate (see Code Civ. Proc., § 1094.5, subd. (b)), the Center for Biological Diversity (the Center) alleged causes of action that the California Fish and Game Commission (the Commission) failed (1) to proceed in the manner required by CESA (California Endangered Species Act; Fish & G. Code, § 2050 et seq.), (2) to adopt a decision supported by its findings, and (3) to adopt findings that are supported by substantial evidence. The relief sought by the Center in all three causes of action was "that the Court issue a writ of mandate commanding the Commission to set aside its prejudicial actions of April 10, 2008 and June 27, 2008 and issue a new decision accepting the Center's petition to list California's pika and advancing the pika to candidacy; or, alternatively, a writ of mandate directing the Commission to reconsider the petition consistent with CESA, and make a timely new decision supported by substantial evidence."

---

[1] The Department of Fish and Game (the Department) was granted leave to intervene after advising the trial court that, should the Center prevail, "The Department would have to undertake a costly and time-consuming 12-month scientific review"—which could require "approximately 3000 hours of staff time"—"and would have to enforce protection of the American pika while it is a candidate species." The Department filed a complaint in intervention in which it alleged that it "unites with the Commission in resisting the claims" of the Center.

The Commission and the Department responded that the Center was entitled to no relief: "The Commission found that the [Center's administrative] petition was 'clearly deficient' due to the absence of required scientific information about population abundance, population trend, distribution, range, and degree and immediacy of threat. In short, there was no evidence the pika in California is being negatively impacted by global warming. Putting aside this lack of evidence, the petition was properly rejected because the evidence in the record was too conflicting, uncertain or speculative to lead a reasonable person to conclude that listing could occur. Accordingly, the Commission respectfully requests that the petition for writ of mandate be denied and dismissed in its entirety and the Commission's decision be upheld in all respects."

After hearing argument, the trial court decided to grant the Center's petition. The relevant portions of its judgment of May 2009 give the court's reasoning:

"The legal standard the Commission must apply in determining whether to accept or reject a petition to consider listing a species under CESA is whether 'the petition provides sufficient information to indicate that the petitioned action may be warranted. . . .' (Fish & G. Code, § 2074.2, subd. (a)(2).) This statutory language has been interpreted to mean 'that amount of information, when considered in light of the Department's written report and the comments received, that would lead a reasonable person to conclude that there is a substantial possibility that the requested listing could occur.' (*Natural Resources Defense Council v. Fish & Game Com.* (1994) 28 Cal.App.4th 1104, 1125 [33 Cal.Rptr.2d 904] (*NRDC*).)

"In the second paragraph of Section III of [the Commission's] Notice of Findings, entitled 'Reason for Finding,' it states: 'In order to accept the petition, the Commission is required to determine that it has information to persuade a reasonable person that there is a substantial possibility that the American pika will be listed.' (Admin. Rec., Vol. II, at p. 329; see also *Id.* at 330 ['The Commission is not persuaded that the decimation of some pika populations in the Great Basin constitutes sufficient information to warrant listing pikas . . . .'].)

"The above-quoted portions of the Notice of Findings do not correctly state the applicable legal standard under *NRDC*. While the correct legal standard is set forth elsewhere in the Notice of Findings, the Court concludes that [the Commission] failed to apply, at least in part, the correct legal standard in making its decision because the incorrect language quoted above is more closely connected to the analysis that [the Commission] conducted. As a result, the Court finds that [the Commission] did not proceed in the manner required by law. (Code Civ. Proc., § 1094.5, subd. (b).)

"A peremptory writ of mandamus shall issue from this Court, remanding the proceedings to [the Commission] and commanding [the Commission] to set aside its Notice of Findings, adopted on June 27, 2008. The writ shall further command [the Commission] to reconsider its action in light of this Court's Judgment and to take any further action specially enjoined on it by law; but nothing in this judgment or in that writ shall limit or control in any way the discretion legally vested in [the Commission].

"[The Center] may submit a Memorandum of Costs and request for attorney's fees."

The Center did so in September 2009, seeking "an award of $247,953.93. This . . . includes $197,197.50 incurred on the merits of this lawsuit, $49,870.00 incurred to date pursuing the instant claim for attorneys' fees, and $886.43 in out-of-pocket expenses."

The following month, on October 16, the Commission and the Department filed opposition to the Center's attorney fee application, asserting that all of the "required elements . . . for a section 1021.5 fee award" were absent. Three days earlier, in its return to the writ filed October 13, the Commission advised the court that it had set aside its decision, prepared and adopted new findings on October 1, 2009, thereby "reaffirming its decision of April 10, 2008, to reject [the Center's] petition to list the American pika as threatened or endangered under the California Endangered Species Act."[2]

The trial court conducted a brief hearing on the Center's fee request, which had increased to $282,936.43 by reason of responding to the Commission and

---

[2] And on October 28, the Center further advised the court that it had that same day filed a new petition for another writ of mandate "alleg[ing] that the Commission failed to reconsider whether pikas may warrant listing in accordance with this Court's writ and has once again prejudicially abused its discretion in rejecting the Center's position." The filing asserted that both cases "arise from substantially identical events[,] . . . involve substantially identical questions of law and fact," and would entail examination of "substantially the same administrative record," thus minimizing the chance the second case would be heard by a different judge. (See Cal. Rules of Court, rule 3.300.) And this second case was eventually heard and decided by the same judge. Almost a year later, in October 2010, the trial court ordered issuance of another writ of mandate in the second case, after concluding that the Commission had "abused its discretion by declining to consider [additional] information submitted by [the Center] prior to the hearing on remand" from the first case. We granted the Commission's unopposed request to take judicial notice of the Center's petition in the second case, and then granted the Center's unopposed request to take judicial notice of the trial court's order, judgment, and writ in the second case. Nevertheless, these subsequent events play no part in our analysis because they were not known to the trial court at the time it made the fee order. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [112 Cal.Rptr.3d 853, 235 P.3d 152]; *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 334, p. 385.) An obvious corollary is that nothing in this opinion should be construed as an expression on the validity of a second fee award, should there be one.

Department's opposition.[3] On December 14, 2009, after making various reductions, the court entered an order awarding the Center fees of $257,675 and costs of $886.43.

## DISCUSSION

### General Principles

Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

In *Karuk*, we explained how an award made pursuant to this statute is reviewed:

" ' "The Legislature adopted section 1021.5 as a codification of the private attorney general doctrine of attorney fees developed in prior judicial decisions. . . . [T]he private attorney general doctrine 'rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.' Thus, the fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." [Citation.]

" 'In order to effectuate that policy, we have taken a broad, pragmatic view of what constitutes a "successful party." "Our prior cases uniformly explain

---

[3] In their written opposition and in their remarks at the hearing, in addition to challenging whether the Center met the legal requirements for an award, the Commission and the Department vehemently assailed the Center's fee request—in its original form and as augmented—as grossly inflated, reflecting "a high degree of inefficiency" devoted to "unreasonable, unnecessary or inappropriate legal work." In fact, the Commission and the Department went so far as to argue that, if the Center did get an award, its requested amount of fees should be reduced "by at least 80%." However, in their briefs on this appeal, the Commission and the Department abandon this line of argument and direct their contentions solely to whether the Center satisfied the legal requirements for an award under section 1021.5.

that an attorney fee award may be justified even when the plaintiff's legal action does not result in a favorable final judgment. [Citations.] It is also clear that the procedural device by which a plaintiff seeks to enforce an important right is not determinative of his or her entitlement to attorney fees under section 1021.5. [Citation.] Similarly, a section 1021.5 award is not necessarily barred merely because the plaintiff won the case on a preliminary issue. [Citation.] ■ In determining whether a plaintiff is a successful party for purposes of section 1021.5, '[t]he critical fact is the impact of the action, not the manner of its resolution.' [Citation.] [¶] The trial court in its discretion 'must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award' under section 1021.5. [Citation.]" ' [Citation.]

"Put another way, courts check to see whether the lawsuit initiated by the plaintiff was 'demonstrably influential' in overturning, remedying, or prompting a change in the state of affairs challenged by the lawsuit. [Citations.] ' "Entitlement to fees under [section] 1021.5 is based on the impact of the case as a whole." ' [Citation.] As for what constitutes a 'significant benefit,' it 'may be conceptual or doctrinal, and need not be actual and concrete, so long as the public is primarily benefited.' [Citation.]

■ "Thus, a trial court which grants an application for attorney fees under section 1021.5 has made a practical and realistic assessment of the litigation and determined that (1) the applicant was a successful party, (2) in an action that resulted in (a) enforcement of an important right affecting the public interest and (b) a significant benefit to the general public or a large class of persons, and (3) the necessity and financial burden of private enforcement of the important right make an award of fees appropriate. ' "On review of an award of attorney fees . . . the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees . . . have been satisfied amounts to statutory construction and a question of law." ' [Citation.]" (*Karuk*, *supra*, 183 Cal.App.4th 330, 362–363, fn. omitted.)

### The Setting in *Karuk*

*Karuk* was an example of why it is sometimes not a good thing to follow the old aphorism, "If at first you don't succeed, try, try again."

*Karuk* involved an effort by a number of private parties to secure mandate compelling a regional water quality control board to enforce the state's Porter-Cologne Water Quality Control Act to dams on the Klamath River

generating hydroelectric power. The problem was that the state had itself tried to assert that very authority, only to be decisively rebuffed, first by the United States Supreme Court, and then by the Ninth Circuit. Unsure whether a 1946 decision of the United States Supreme Court established federal preemption over the subject of regulating power-generating dams on navigable rivers, the state commenced litigation to determine whether it could enforce Porter-Cologne. In 1990, the United States Supreme Court unanimously held that the 1946 decision did indeed exclude state regulation. The state then tried a different litigation tack—claiming the power to enforce its clean water law—only to be peremptorily rejected by the Ninth Circuit. So, when the private parties proposed to go down this well-traveled path once again, having been turned away by the regional water quality control board, the state was not unsympathetic, but it was unwilling to suffer a third defeat. It thus opposed the private parties' effort to get a state court to order the regional water quality control board to intrude into this field of exclusive federal jurisdiction. (*Karuk, supra*, 183 Cal.App.4th 330, 343–354 & authorities cited.)

The trial court, on its own initiative, issued a writ of mandate that directed the regional water quality control board to reconsider its administrative decision in light of two United States Supreme Court decisions addressing state power under the federal clean water law. The board did so, reaching the exact same result, i.e., that the entire regulatory field was subject to federal preemption, leaving no opportunity for the state to enforce its clean water law. The trial court agreed with this conclusion, and denied the private parties' mandate petition. Nevertheless, the court awarded the private party plaintiffs $138,250 in attorney fees under section 1021.5, concluding that the litigation had resulted in an important public benefit in that regional water quality control board had been compelled to make a thoughtful and " 'well-reasoned determination' " as to whether state or federal law applied. (*Karuk, supra*, 183 Cal.App.4th 330, 338–341, 361.)

We reversed, holding that the trial court's award was not warranted by section 1021.5:

 "Before plaintiffs commenced this litigation, the Board declined to enforce Porter-Cologne against the Klamath River dams on the ground that, as to the matter of water quality, federal authority was supreme and exclusive. When this litigation ended, the Board was still declining to enforce Porter-Cologne. Again, to quote the Board, 'the final result of [plaintiffs'] efforts before the trial court were to change nothing, and those efforts had no impact on the Board's position as it existed when the action was first filed.' The only difference was that the Board now had the concurrence of the trial court. If ' " 'the critical fact is the impact of the action' " ' [citation], that impact can

only be described as nil. '[I]n order to justify a fee award, there must be a causal connection between the lawsuit and the relief obtained' [citation] or 'a change in the defendant's conduct' [citation]. But here there was neither genuine relief obtained by plaintiffs nor change by the Board. Any realistic assessment of this litigation from a practical perspective based on the impact of the case as a whole [citations] can come to no other conclusion.

■ "California accepts that ' " 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on *any significant issue* in litigation which achieves some of the benefit *the parties sought* in bringing suit.' " ' [Citations.] The only relief/achievement/success from this litigation was the remand to the Board. However, it was not a significant issue—indeed, it was no issue—and it certainly was not sought by plaintiffs, but was engineered by the trial court for its own reasons." (*Karuk, supra,* 183 Cal.App.4th 330, 365–366.) In addition, we determined that, because the regional water quality control board was not statutorily required to provide an explanation for its administrative decisions, compelling it to provide a *more* detailed explanation did not qualify as either a "significant benefit" or enforcement of an "important right affecting the public interest" within the meaning of section 1021.5. (183 Cal.App.4th at pp. 367–369.)

### *Karuk* Applied Here

As mentioned at the start of this opinion, our decision in *Karuk* was filed after the trial court made the award to the Center. However, it forms the keystone of the appeal by the Commission and the Department, and it consequently draws most of the responding fire from the Center. Although the Center correctly identifies *Karuk* as distinguishable in several minor respects,[4] we conclude that the Commission and the Department correctly see it as controlling.

The Center states that *Karuk* is fundamentally distinguishable because it, the Center, "won this case: it achieved a vacatur of the decision it challenged; it secured the remand for which it had alternatively plead [*sic*]; and it obtained . . . precisely the relief it requested in its petition for writ of

---

[4] For example, the Center correctly distinguishes *Karuk* on the ground that there the regional water quality control board was not required to put its decision in any particular form, whereas here the Commission was statutorily obligated to put its denial of the Center's petition in a specified form. (See Fish & G. Code, § 2074.2.) In addition, the administrative agency in *Karuk* was deciding only a pure issue of law, whereas "the section 2074.2 determination is a quasi-adjudicatory one that contemplates the Commission weighing the evidence for and against candidate listing and deciding essentially a question of fact . . . ." (*Natural Resources Defense Council v. Fish & Game Com., supra,* 28 Cal.App.4th 1104, 1116.) Nevertheless, as shown by our ensuing discussion, these are minor points.

mandate, and not a remedy that was not plead[ed] or was solely the 'brainchild of the trial court.' " (Quoting *Karuk*, *supra*, 183 Cal.App.4th 330, 364.) We do not agree.

In its petition, the Center alleged that the Commission's decision not to list the pika was defective for three reasons: (1) "the Commission fundamentally misapplied CESA's listing standards"; (2) "the Commission also failed to give 'meaningful consideration' to substantial evidence indicating that listing may be warranted"; and (3) "the Commission failed to consider whether any of the five pika subspecies in California may warrant listing as threatened or endangered 'throughout all, or a significant portion, of its range.' (Fish & G. Code §§ 2062, 2067.) Instead, the Commission concluded only that there was insufficient evidence 'to warrant listing pikas within the Sierra Nevada ecoregion in California.' The Commission failed entirely to consider whether the subspecies that inhabit the Cascades and Great Basin within California may warrant listing as endangered or threatened."

Although the Center apparently gave equal importance to each of the three factors, an examination of the allegations demonstrates that the matter of the Commission misconstruing and misapplying the listing process was not the primary target of the petition. Considerably more attention was given to alleging that the Center had already presented the Commission with more than enough information to warrant listing the American pika, but the Commission "inexplicably" "ignored," "misrepresented," and "failed entirely to evaluate" or consider the material submitted by the Center. Even more damning, the Center alleged that the Commission "improperly demanded" evidence that "raised the bar for accepting a species as a listing candidate."

The trial court declined to grant the Center's prayer that the court order the Commission to "issue a new decision accepting the Center's petition," but it did order the alternative relief of "a writ of mandate directing the Commission to reconsider the petition consistent with CESA."

Does this qualify as a "significant benefit" or "the enforcement of an important right affecting the public interest"? No one disputes that CESA embodies a significant public policy and enforcing it constitutes an important public interest. (E.g., Fish & G. Code, §§ 2051, subd. (c), 2052, 2055); *Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 979 [110 Cal.Rptr.3d 876]; *California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1545 [68 Cal.Rptr.3d 391].) But was that interest actually "enforced" in a manner that resulted in a "significant benefit"? We think not.

The Center's petition was returned to the Commission for reconsideration because the trial court believed the Commission might have employed an

incorrect standard when it evaluated that petition. The trial court did not decide that the Commission had actually used the wrong standard, only that there was an appreciable risk that it may have erroneously evaluated the petition. Thus, it was not a substantive remand, but a purely procedural one. The trial court took pains to avoid reaching the merits of the petition, or precluding the Commission from undertaking a plenary review.[5] Most conspicuously, the court did not accede to the Center's prayer that its petition to the Commission deserved to prevail as a matter of law, i.e., by overturning the Commission's finding that the Center had not produced sufficient evidence. This was the Center's "strategic objective." (*Karuk, supra,* 183 Cal.App.4th 330, 335.) It was not achieved.

When the Commission reviewed the petition for the second time, it reached the same conclusion as it had before. The Commission's second decision was slightly longer than its first, but the bottom line result was the same.[6] *Ochotona princeps* was still not accepted for listing, and for the same reason—"the petition provided insufficient information." Moreover, by the time the trial court made the fee award, that determination by the Commission had not been overturned or shown to be legally erroneous. We stated in *Karuk:* " '[I]n order to justify a fee award, there must be a causal connection

---

[5] Recall that in its order, its judgment, and the writ issued under its process, the trial court repeatedly advised that "nothing in this judgment or in that writ shall limit or control in any way the discretion legally vested in [the Commission]."

[6] This may best be shown by comparing the concluding paragraphs, the "Final Determination By Commission," of the two decisions.

The paragraph for the first decision read: "The Commission has weighed all the scientific and general evidence in the petition, the Department's written report, and written and oral comments received from members of the public. Based upon that evidence, the Commission has determined that, although there may be some reason for concern, the petition provides insufficient evidence to persuade the Commission that the petitioned action may be warranted (Fish and Game Code Section 2074.2). In making this determination the Commission finds that the petition does not provide sufficient information in the categories of population trend, abundance, and degree and immediacy of threat to find that the petitioned action may be warranted. The Commission also finds that the petition provided insufficient information range-wide regarding population trends and abundance and immediacy of threat for the Commission to adequately assess the threat and conclude that there was a substantial possibility that the species will qualify for listing."

The paragraph for the second decision read: "The Commission has weighed and evaluated all information and inferences for and against accepting the petition, including the scientific and general evidence in the petition, the Department's written report, and written and oral comments received from members of the public. Based upon the record, the Commission has determined that the petition and overall record provides insufficient evidence to persuade an objective, reasonable person that the petitioned action may be warranted (Fish and Game Code Section 2074.2). In making this determination the Commission finds that the petition does not provide sufficient information in the categories of population trend, abundance, and degree and immediacy of threat for the Commission to adequately assess the threat and find that an objective, reasonable person would conclude there was a substantial possibility that listing the species could occur."

between the lawsuit and the relief obtained' [citation] or 'a change in the defendant's conduct' [citation]. But here there was neither genuine relief obtained by plaintiffs nor change by the Board. Any realistic assessment of this litigation from a practical perspective based on the impact of the case as a whole [citations] can come to no other conclusion." (*Karuk, supra,* 183 Cal.App.4th 330, 365–366.) All one has to do is substitute "the Center" for "plaintiffs" and "the Commission" for "the Board" and the reasoning is equally applicable. So is the conclusion that "If ' " 'the critical fact is the impact of the action' " ' [citation], that impact can only be described as nil." (*Id.* at p. 365.)

All the Center achieved was a limited "do-over." Granted, the Center did obtain what could be considered a "final judgment."[7] Without question, process is important, and it is certainly essential that administrative agencies conduct their operations according to a correct understanding of the law. But it is surpassingly difficult to imagine the Center commenced this action solely to get the Commission to correct the possible misapprehension of law that was the subject of the trial court's writ. The Center was after bigger game. Although it now points to the fact that "precisely the relief it requested" was what was granted by the trial court, this is not self-evident. True, the Center did pray for "alternatively, a writ of mandate directing the Commission to reconsider the petition consistent with CESA," but this was only if the Center could not get "a writ of mandate commanding the Commission to . . . issue a new decision accepting the Center's petition to list California's pika."

"[A]nd, when the dust settled, [the Center's] only victory was in a statement . . . that . . . clarified why [the Center] should lose." (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376, 388 [114 Cal.Rptr.3d 351].) *Karuk* was merely the latest of decisions holding that minor revisions or rewordings are not sufficiently significant to support an award under section 1021.5. (E.g., *Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 335 [31 Cal.Rptr.3d 599] ["the inadequacy was 'minute blemish' that could be repaired"]; *King v. Lewis* (1990) 219 Cal.App.3d 552, 556 [268 Cal.Rptr. 277]

---

[7] We use the term with obvious caution. "A judgment is the *final* determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577, italics added.) " 'A judgment is final "when it terminates the litigation between the parties *on the merits* of the case and leaves nothing to be done but to enforce by execution what has been determined." ' " (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 304 [63 Cal.Rptr.2d 74, 935 P.2d 781], italics added; accord, *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698 [107 Cal.Rptr.2d 149, 23 P.3d 43]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 96, pp. 158–160.) Although the Center obtained a judgment, it seems problematic to treat it as final. Wholly apart from the existence of the subsequent "related" action filed by the Center establishing that the fight with the Commission goes on (see fn. 2, *ante*), it defies credulity to believe that the object of the Center's litigation strategy was as modest as the limited relief ultimately found in the trial court's writ.

["changes . . . achieved by the writ were 'relatively insignificant' when compared to the totality of relief sought"]; *Mandicino v. Maggard* (1989) 210 Cal.App.3d 1413, 1416 [258 Cal.Rptr. 917] ["de minimis modifications . . . did not benefit the public"].)

■ The dispute between the Center and the Commission is obviously not at an end. There may be protracted further proceedings. We do not deny that interim fee awards may have a legitimate place under section 1021.5. (See Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed. 2010) §§ 2.90, 2.93, pp. 92–93, 95–96 & decisions cited.) We only hold that round one of this dispute did not result in $257,675 of substantial benefit to the people of California.

## DISPOSITION

The order is reversed.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied June 1, 2011, and respondent's petition for review by the Supreme Court was denied August 17, 2011, S192713.