Filed 9/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SUMMIT MEDIA LLC, | B255050 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS116611) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent; | |
| CBS OUTDOOR LLC et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from orders of the Superior Court for the County of Los Angeles. Terry A. Green, Judge.  Affirmed.

Perkins Coie, Timothy L. Alger, Julie E. Schwartz and Sunita Bali for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney, and Tayo A. Popoola, Deputy City Attorney, for Defendant and Respondent.

Kendall Brill & Klieger, Laura W. Brill and Richard M. Simon for Real Party in Interest and Respondent Outfront Media Inc.

Latham & Watkins, James L. Arnone and Benjamin J. Hanelin for Real Party in Interest and Respondent Clear Channel Outdoor, Inc.

_____

# SUMMARY

This is the second appeal in a dispute among several outdoor advertising companies and the City of Los Angeles over certain billboards with digital displays. In the first appeal, we affirmed the trial court's finding that a settlement agreement between two of the companies and the City, allowing the companies to digitize many of their existing billboards, was illegal and void, because a municipal ordinance expressly prohibited " 'alterations or enlargements' " of such signs. (*Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 924 (*Summit Media I*).) We also concluded, contrary to the trial court's judgment, that it was necessary to revoke all digital conversion permits granted under the illegal settlement agreement. (*Ibid.*) We directed the trial court "to amend its order so that it invalidates all digital conversion permits issued by the city to real parties under the settlement agreement." (*Id.* at pp. 941-942.)

The trial court, after hearings, promptly amended its order, declaring the digital conversion permits invalid. The trial court's order also identified the signs at issue, and ordered the immediate discontinuation of digital use of the signs. In compliance with the trial court's order (the April 2013 order), the parties turned off the digital displays, and the signs went dark.

Plaintiff Summit Media – the company that successfully challenged the illegal settlement agreement – then filed a motion seeking, among other things, an order that "[a]ll digital displays and sign structures" identified in the April 2013 order "shall be demolished and removed . . . ." Real parties Clear Channel Outdoor, Inc. and Outfront Media Inc. (formerly CBS Outdoor), on the other hand, wished to resume the use of their sign structures to display static advertising, as they had before the illegal digital conversion. Plaintiff also sought attorney fees under Code of Civil Procedure section 1021.5, the "private attorney general" attorney fee statute (section 1021.5), for the legal work that successfully voided the illegal agreement and rid the city of most digital billboards.

After extensive litigation, the trial court denied plaintiff's motion to demolish the signs and denied the attorney fee motion. Plaintiff timely appealed.

2

We affirm the trial court's orders.

## FACTS

### 1. The Background

We will not repeat here the facts surrounding the initial disputes that led to our decision in *Summit Media I*. The interested reader may find the details in that decision. For our purposes here, this brief summary should suffice.

Plaintiff and real parties are all engaged in the lucrative outdoor advertising business in the city, owning and maintaining numerous "off-site signs"—billboards in locations other than at a property owner's business. In April 2002, the city established a permanent, general ban on new off-site signs (with exceptions that are irrelevant to this appeal), and a ban on "alterations or enlargements of legally existing off-site signs" (the 2002 sign ban). This sign ban, along with other ordinances calling for inspections and inspection fees for off-site signs, generated a maelstrom of lawsuits in state and federal courts filed by real parties, plaintiff, and others.

Eventually, in September 2006, the city and real parties entered into an agreement settling their disputes. The settlement agreement exempted real parties from the 2002 sign ban, the inspection program, and numerous other zoning and building laws regulating off-site signs. The agreement required the city to issue new permits allowing real parties to modernize a large number of their off-site signs, despite the ban on that kind of modification, and whether or not the signs violated present or prospective building and zoning ordinances. The settlement agreement also exempted real parties from the usual procedures for obtaining permits. Real parties immediately undertook significant modifications of their off-site signs, otherwise prohibited by the 2002 sign ban, including the conversion of existing static, wood and vinyl signs to digital displays. (We describe the scope of the modifications more fully *post*.)

In August 2008, plaintiff filed this lawsuit, challenging the settlement agreement as illegal and void. While that litigation was pending, the city enacted an ordinance, effective in August 2009, explicitly banning off-site signs with digital displays. (The ordinance's "whereas" clauses indicated that real parties' digital conversions were

3

"causing unanticipated negative impacts including negative impacts on residential neighborhoods . . . .")

As noted above, the trial court granted plaintiff's motion for a writ of mandate, ordering the city to set aside and cease implementing the settlement agreement. Real parties appealed, proffering numerous bases for error in voiding the settlement agreement. Plaintiff cross-appealed, contending the trial court should also have revoked the digital conversion permits the city issued in violation of the 2002 sign ban. Plaintiff argued: "The *de minimis* burden that might be shouldered by [real parties] if they must apply for new permits under the same laws that apply to everyone, and/or remove the digital displays, is far outweighed by public policy requiring fair and consistent application of the zoning laws. No one asked the Superior Court or this Court to order that the digital displays be destroyed. This is not a matter of demolition of a structure or the loss of a property right. Rather, [real parties] must go through the process that everyone else must use to obtain a sign permit." Plaintiff concluded by asking this court to "enter judgment invalidating all digital conversion permits issued by the City to [real parties] under the Settlement Agreement."

We agreed with plaintiff, concluding the settlement agreement was illegal and void, and there was no legal basis for the trial court's refusal to revoke digital conversion permits issued under an illegal agreement and in violation of unambiguous municipal ordinances. We ordered the trial court to amend its order to invalidate all digital conversion permits issued under the settlement agreement. (*Summit Media I, supra,* 211 Cal.App.4th at p. 942.)

2.    **Proceedings After the Remittitur in *Summit Media I***

Our remittitur issued on March 14, 2013, and the parties immediately began filing proposed orders and other papers in the trial court.

a.    **The April 2013 order**

After hearings, the trial court amended its November 4, 2009 order granting the writ of mandate. The April 2013 order stated that the digital conversion permits issued by the city to real parties under the settlement agreement, identified in the order, "are

4

hereby declared invalid and the digital use of the digital signs shall be discontinued."
The April 2013 order identified, by permit number and address, 84 Clear Channel
Outdoor digital permits and 15 CBS Outdoor digital permits that were declared invalid.
The order further stated: "This Order does not consider nor enter judgment regarding any
rights concerning non-digital signs or non-digital aspects of digital sign permits. The
parties retain all of their rights as to those matters." The court stated it retained
jurisdiction, including over any motion for attorney fees or costs.

### b. Proceedings after the April 2013 order

Real parties discontinued digital use of their signs, in compliance with the court's
April 2013 order.

A few weeks later, plaintiff filed a motion for orders "for removal and demolition
of digital sign faces and structures that are subject to the Court's Order of April 16, 2013"
(the demolition motion). Plaintiff's demolition motion also asked for orders "invalidating
all other permits or 're-permits'" issued to real parties pursuant to the settlement
agreement and "further orders effectuating this Court's writ of mandate and in
conformance with" this court's *Summit Media I* decision.

On the same day, real party Outfront Media notified the city that it intended to
continue to use its permitted sign structures for off-site signage "and proposes to install
vinyl copy over the non-operative digital faces on or after May 17th." The city sought an
order preserving the status quo, and on May 9, 2013, the court ordered real parties "to
retain the status quo and not install any advertising on their digital structures" pending a
hearing on plaintiff's demolition motion.

### c. The work performed in converting the signs to digital displays

The parties conducted a great deal of discovery in anticipation of the hearings on
the demolition motion, including on the scope of the work that had occurred in
connection with the conversion of real parties' signs to digital displays. There is no
significant disagreement on what was done to the signs when they were modernized with
digital displays.

5

As plaintiff describes the work, real parties removed the pre-existing static faces from the steel superstructures. They placed LED units on the superstructures using a crane, typically attaching them to an existing steel framework mounted on the sign structure's load-bearing horizontal girder or crossbar, using clamps or clips. These LED units can be removed from the signs without any changes to the sign structure.

In addition, real parties removed the platforms (or catwalks) that had been used by workers to change static advertisements, removed existing lighting, upgraded the electrical system, and added web cameras and satellite dishes to the signs. Many of the signs required the addition of gussets (or braces) or reinforcement of the existing foundation.

Ricky L. Tiedeman, who oversaw the digital sign face installations for Clear Channel, described the reinforcement work this way: Clear Channel "upgraded the existing sign support structures that framed the new digital displays to ensure the adequacy of the structural system in resisting seismic and wind loads, and supporting dead loads [(the increased weight of the digital face)]," and at some locations, was required to improve the concrete support slabs at the pole base to address seismic and wind loads and support dead loads.

Under the illegal settlement agreement, Clear Channel converted more than 80 existing nondigital sign faces to digital signs. Clear Channel obtained three other permits for digital modernization, but these expired before any work was done. Outfront Media modernized 13 of its signs to include digital displays.[1]

Under the settlement agreement, real parties also made other alterations to their signs that would not otherwise have been allowed. For example, Clear Channel installed six nondigital second sign faces on pre-existing signs under the settlement agreement,

---

[1] The parties report the total number of signs converted to digital displays with slight differences, possibly due to the three permits that expired before any work was done and two digital signs that were properly approved under exceptions to the 2002 sign ban. But there is no actual dispute among the parties over the total number of digital displays or over any particular sign.

and obtained "re-permits" for two sign structures. ("Re-permitting" occurred in cases where a building permit for the existing sign could not be found.) Outfront Media likewise installed second sign faces and obtained re-permits it could not have otherwise obtained.

According to Mr. Tiedeman, installation of the digital sign faces did not change the location of the existing sign or sign structure in any instance; did not increase the size in any instance; and did not require replacement or rebuilding of the existing sign structure's primary column. Nor was the height or orientation changed, except in three instances.

### d. The hearings on the demolition motion

The court held several hearings on plaintiff's demolition motion and related discovery issues. At the first, on September 16, 2013, plaintiff urged the court to issue a categorical order requiring real parties to undo all work that was done pursuant to permits issued under the settlement agreement. Real parties contended they had the right to resume static advertising on the signs that were digitized.

The city explained to the trial court its understanding of how the Los Angeles Municipal Code (LAMC or municipal code) applied to real parties' illegal digital signs at this juncture: "[T]he Code grants the sign companies the right to obtain building permits, through a ministerial process, to return the digital signs to their original state prior to the execution of the Settlement Agreement (i.e., as static billboards). The Code also allows Clear Channel and CBS to apply for a discretionary significant modification to allow the digital faces to stay in place and be wrapped with static advertising copy." The city also told the trial court that the municipal code does not authorize "re-permitting," so any "re-permits" were invalid. Counsel for the city observed that the Department of Building and Safety would need to get involved to ensure the structural safety of any proposed sign alterations.

The court stated that "any sign that has its existence solely because of the settlement agreement has to be taken down or replaced. . . ." The court set a further

7

hearing  "to determine which of these signs at issue have independent viability apart from the settlement agreement."

At a hearing on November 22, 2013, the trial court ruled on plaintiff's demolition motion.  The court entered its written order on March 3, 2014.  With respect to the structures that were subject to the April 2013 order, the court (1) denied plaintiff's request for removal of the digital sign faces from the structures; (2) denied plaintiff's request for demolition of the structures; and (3) partially granted plaintiff's request for removal of other alterations performed on the structures pursuant to the settlement agreement, ordering that two of Clear Channel's digital signs be lowered to their pre-settlement agreement permitted heights.  The court also (4) granted plaintiff's request for invalidation of all permits for the erection of "second faces" issued under the settlement agreement (six Clear Channel signs and two Outfront Media signs), and ordered the second sign faces removed.  And (5), the court granted plaintiff's request for the invalidation of all "re-permits" issued under the settlement agreement (two Clear Channel signs and three Outfront Media signs).

e.      **Developments after the trial court's ruling**

Before the trial court's ruling, and continuing thereafter, real parties began the process of seeking permits from the city to return their digitized signs to their original state as static billboards.**2**

Outfront Media obtained permits to alter 11 of its 13 digital signs to resume legal nonconforming use, by removing the inoperative digital apparatus and reinstalling

---

**2**      During briefing of this appeal, several requests for judicial notice were filed and some rulings were deferred.  We now grant the requests of plaintiff, Outfront Media, and Clear Channel, respectively, for judicial notice of various applications, permits for the removal of digital displays and restoration of pre-settlement framing, city approvals of significant modifications allowing the continuation in place of the digital LED apparatus and installation of illumination and catwalks, and various staff reports on the applications.  We deny as unnecessary Outfront Media's request for judicial notice of excerpts from oral argument before this court in *Summit Media I* and excerpts from plaintiff's opening brief in that case.

conventional steel frame catwalks and lighting. For its other two digital signs, Outfront Media applied to the city for permission to maintain the digital apparatus in place to be wrapped with static, printed messages, and the city approved those requests.

Similarly, real party Clear Channel applied for and received 81 permits to remove turned-off digital sign faces installed pursuant to the settlement agreement, and to replace the sign face with conventional frame panels for the display of printed vinyl messages. For 64 of these signs, Clear Channel further sought and received approval of significant modifications allowing Clear Channel, in the alternative, to leave in place the turned-off digital sign faces, wrap them with printed vinyl messages and re-install pre-existing lights and catwalks.

The city's findings approving the significant modifications indicated that the removal of the digital sign faces was impractical "because its exterior frame and face can be utilized as backing for conventional vinyl wrap sign copy," and removing the display "would be wasteful, costly, and would not serve any benefit to the public or the sign users in regards to improved legibility, readability, visibility, traffic safety, and public safety." Allowing the disabled digital sign faces to remain "would not interfere with traffic safety or otherwise endanger public safety, while removing [them] and constructing a new conventional frame and static display would. Lengthy construction activities would require the temporar[y] clo[sure] of traffic lanes and sidewalks for the placement of construction vehicles and a crane," directly affecting traffic flow and potentially traffic safety. Wrapping the exterior faces of the signs "will not require a crane or multiple construction vehicles and the resulting sign display will be functionally and aesthetically identical to the previously approved conventional sign display."

### f. The attorney fee motion

While the parties were litigating the demolition motion, plaintiff was also seeking attorney fees under section 1021.5 for the legal work that successfully voided the illegal agreement and rid the city of most digital billboards. On April 23, 2013, plaintiff filed its motion for attorney fees, seeking an award of $2,618,215.13 (a lodestar amount of $1,745,476.75 (fees and costs in the trial court) with a 1.5 multiplier). Plaintiff also

9

sought costs incurred in the appeal in *Summit Media I* ($230,047.20 in fees and $4,179.17 in expenses).  By the time of the hearing in January 2014, supplemental filings showed plaintiff sought a total (lodestar) amount of more than $3 million.

At a hearing on January 21, 2014, the trial court denied plaintiff's motion for attorney fees.  The court found that, while plaintiff's lawsuit resulted in the enforcement of an important right affecting the public interest, and conferred a significant benefit on the general public, the litigation did not meet the third requirement for fees:  it did not impose a financial burden on plaintiff that was out of proportion to plaintiff's individual stake in the matter.

Plaintiff filed a timely appeal from the trial court's orders.

## DISCUSSION

### 1.     The Demolition Motion

Plaintiff contends on appeal that, in order to "fully effectuate" the writ of mandate invalidating the digital conversion permits, the trial court was required not only to order the digital displays extinguished (as it did), but also to order the physical removal of all changes real parties made to the signs and structures under the now-revoked digital permits.  In other words, the trial court should have ordered any improvements made to the support structure of a sign to accommodate the heavier digital display – such as upgrading the concrete support slabs at the pole base, reinforcing the existing foundation, adding gussets or braces, and so on – to be destroyed.  At a minimum, plaintiff contends, the trial court should have ordered the digital display equipment to be taken down rather than simply turned off, pointing out that it can be removed without damaging the equipment or the sign structure.  Otherwise, plaintiff argues, the writ "has no effect, and the illegality that provided the grounds for the writ continues."

We find no error in the trial court's disposition of plaintiff's demolition motion.

### a.     The standard of review

We may reverse a trial court's determination of whether there has been compliance with its writ only for abuse of discretion.  (*Cosgrove v. County of Sacramento* (1967) 252 Cal.App.2d 45, 50 ["not much, if any, leeway is left to an appellate court to

10

control the action of the trial court, when the trial court had before it substantial evidence upon which to act"; rules governing the scope of review in civil actions generally apply to appeal in mandamus proceedings; "[t]he judgment is presumed to be correct, and the burden is on appellant to show reversible error"].)

### b.      A preliminary consideration - the waiver issue

The trial court expressed its concern that plaintiff did not seek demolition of the signs until after issuance of our remittitur.  The parties argue at length over whether, by failing to seek demolition of the signs in the trial court in the original proceedings, or in our court in the *Summit Media I* appeal, plaintiff forfeited the right to do so now.  We think not.

The trial court has the authority to grant additional relief not expressly sought by the petitioner in writ proceedings, if the relief is necessary to enforce the writ.  (*Housing Authority v. City of Los Angeles* (1953) 40 Cal.2d 682, 688 [ordering city to comply with a previously issued writ by annexing certain territory; the annexation question was not specifically presented in the earlier writ proceeding]; *California Trout, Inc. v. Superior Court* (1990) 218 Cal.App.3d 187, 204 ["That petitioners originally prayed for a different remedy does not preclude the court from granting an appropriate remedy not made the subject of the prayer."].)

In short, if enforcement of the writ requires, for its effectuation, the demolition of real parties' signs, then the signs must be demolished, and whether or not plaintiff sought that relief in the first instance is of no consequence.  But that is not the case.

### c.      Elimination of digital displays versus demolition and removal

Here, we see no abuse of discretion in the trial court's refusal to require either the demolition of the structural improvements or the removal of the digital equipment.  The trial court said this in so ruling:  "I don't see a functional difference between ordering [the digital signs] turned off never to be displayed again until or unless at some point they are legal under the process – under the level playing field [–] or wrapping them, having them remain black or static if the City approves of that.  I see no functional difference there.  Either way, the digital conversion, which is what [the Court of Appeal] said was

11

invalid, is no more. These digital conversions will now cease to exist unless the appropriate governmental agencies at some point in the future pursuant to rules that apply to all citizens and entities equally say otherwise."

Plaintiff protests that the invalid digital permits allowed real parties "to make structural and electrical changes to their signs to accommodate the digital displays, and ultimately erect those heavy and costly monitors." These illegally altered billboards "continue to exist" and "violate the law regardless of whether they are turned 'on' or 'off,' or wrapped with new vinyl advertisements."

We do not see it that way. Of course it is indisputable that the signs were altered in violation of the law, as we found in *Summit Media I*. But it does not follow, as a necessary consequence, that they must be destroyed on that account, so long as the illegality at their core is eliminated – and the central illegality is the digital *display*, not the structural reinforcement and equipment that made the display possible. Indeed, in its motion for attorney fees (discussed in pt. 2, *post*), plaintiff pointed out that it is "beyond debate that [plaintiff] entirely succeeded" in its lawsuit: it obtained invalidation of the settlement agreement from the trial court; invalidation of the digital conversion permits from the Court of Appeal; and "[o]n remand, [the trial court] took the step necessary to give meaning to its writ, and ordered the digital signs turned off."[3] The "two concrete benefits" that flowed to the public from plaintiff's lawsuit were "(1) the existing digital billboards have been turned off, and their permits have been revoked; and (2) residents no longer face the prospect of Real Parties erecting hundreds of additional digital billboards throughout the City, without any opportunity to be heard." The writ completely effectuated these benefits.

---

[3] Plaintiff also told the trial court that real parties were "lobbying in City Hall for a new ordinance that might allow them to resume operation of their digital billboards," but "[s]uccess is highly unlikely," and "any such ordinance, to withstand challenge, will be the result of extensive public hearings, input from community stakeholders, and careful consideration of the controlling general laws *and* the impact of digital signs on Los Angeles and its citizens."

12

Plaintiff offers no persuasive authority for its claim that, to effectuate its writ, the trial court was required to do more than eliminate the digital displays. The only authority it cites for requiring removal is section 91.6216.3 of the municipal code. That section provides that "[e]very existing sign and/or sign support structure . . . constructed without a valid building permit shall be made to conform to the current provisions of this Code or shall be demolished and removed. Any use of an existing sign constructed without a valid building permit shall be discontinued." Plaintiff, without further analysis, tells us that "the unambiguous language" of section 91.6216.3 "requires removal or demolition of all unpermitted signs or sign support structures . . . ." We do not agree.

LAMC section 91.6216.3 on its face requires demolition and removal only if signs or structures without valid permits cannot be made to conform to current municipal code provisions. Plaintiff has not shown this is so. Plaintiff's apparent position is that the illegally digitized signs cannot be made "to conform to the current provisions of this Code," because the current provisions ban off-site signs entirely. That position ignores other provisions of the municipal code, including provisions governing sign rights that existed when the ban on off-site signs was enacted. We decline to construe section 91.6216.3 without regard to other pertinent provisions of the code. It seems to us quite plain that section 91.6216.3 requires real parties' digitized signs to be brought into conformance with the municipal code, which means that use of the signs for digital displays must be discontinued. Demolition would be necessary only if the signs could not be brought into conformance with the current code requirements.

Plaintiff also asserts that demolition is required because real parties, by illegally altering their signs for digital display, "lost their right to engage in static advertising at those sites, as a legal nonconforming use . . . ." The only authority plaintiff offers for this proposition is a municipal code provision, LAMC section 12.23(C)(3). That section provides: "Any existing nonconforming sign . . . may be continued, provided that no structural, electrical or mechanical alterations are made to the sign except as permitted in Section 91.6206 of this Code." (Section 91.6206 is entitled "Electrical" and incorporates the provisions of an appendix to the California Building Code.) According to plaintiff,

13

this means that, because real parties altered their signs, the signs may not be returned to their original use. But LAMC section 12.23 does not say so – it merely says that alterations must be made in conformance with the Building Code. Plaintiff offers no other authority suggesting that the municipal code prohibits return of the signs to their previously permissible use.

Lacking any authority for the proposition that signs, once altered with invalid permits, may not be returned to their original nonconforming use, plaintiff argues that real parties "*abandoned* their grandfathered rights when they modernized the signs and stopped engaging in the legal nonconforming use for more than one year." They cite LAMC section 12.23(B)(9). Section 12.23(B) is entitled "Nonconforming Use of Buildings," and paragraph 9 states: "**Discontinuance of Use.** A building or structure or portion [of] a building or structure, which contains a nonconforming use which is discontinued for a continuous period of one year, shall only be occupied by a use that conforms to the current use regulations of the zone and other applicable current land use regulations."

We are not persuaded that real parties abandoned the use of their signs by digitizing them. LAMC section 12.23(B) does not apply to prevent real parties from returning their signs to their original use for static, rather than digital, advertising. The "nonconforming use" in this case is the maintenance of an off-site sign, which (with irrelevant exceptions) is otherwise forbidden. (LAMC, § 14.4.4.) We cannot say that real parties at any time abandoned or discontinued their nonconforming use of the signs. While they converted their signs from static to digital displays, an alteration that was illegal, that hardly constitutes abandonment of the right to use their signs to display advertising.

Plaintiff cites no persuasive authority to the contrary. Plaintiff merely points out that public policy favors the elimination of nonconforming uses; that "generally there can be no resumption of a nonconforming use which has been relinquished" (*City of Los Angeles v. Wolfe* (1971) 6 Cal.3d 326, 337); and that public policy does not favor the expansion or change of nonconforming uses (*People ex rel. Dept. of Pub. Wks. v. Ryan*

14

*Outdoor Advertising, Inc.* (1974) 39 Cal.App.3d 804, 813). All that is so, but none of those principles supports the proposition that real parties at any time abandoned their nonconforming use of the signs. They expanded that nonconforming use through a settlement agreement that was illegal and void, but that expansion has been nullified, and no authority supports plaintiff's claim that the preexisting nonconforming use was relinquished. Indeed, the pertinent authorities suggest the contrary. (See *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 575 (*Hansen Brothers*) ["When it appears that a nonconforming use is being expanded, the county may order the operator to restrict the operation to its former level"].)

*Pallco Enterprises, Inc. v. Beam* (2005) 132 Cal.App.4th 1482 (*Pallco*) demonstrates the point. There, an outdoor advertising company (Pallco) contended that removal of a competitor's advertising display was required, "because the prior nonconforming use was voluntarily abandoned through nonuse when the [property owners] added illumination" – an illegality that had continued for five years. (*Id.* at pp. 1497-1498.) The court first stated the applicable principles: "Abandonment of a nonconforming use involves both an intent to abandon and ' "an overt act, or failure to act, which carries the implication the owner does not claim or retain any interest in the right to the nonconforming use." ' [Citation.]" (*Id.* at p. 1498, quoting *Hansen Brothers, supra,* 12 Cal.4th at p. 569.) "Mere cessation of use alone is not enough . . . ." (*Pallco*, at p. 1498.)

*Pallco* rejected the claim that the "abandoned . . . legal, nonconforming use" could not be resumed, stating: "We are not persuaded. The [property owners] never abandoned their legal, nonconforming use. Rather, they expanded that use by adding illumination. This is akin to an owner of a right-of-way easement increasing the traffic over the easement. The increase may be improper, but there was never an abandonment of the original use." (*Pallco*, *supra,* 132 Cal.App.4th at p. 1498 ["Pallco cites nothing to support its novel theory that an expansion of a use is an abandonment of the original use."].) The same is true here.

15

Finally, we do not find persuasive plaintiff's argument that, because the signs have not been demolished, the city is providing "special treatment" to real parties, who "continue reaping benefits of the Settlement Agreement to this day . . . ." The only "continuing benefit" of the settlement agreement that plaintiff identifies is that the signs have been "repurposed for static advertising" instead of being demolished; plaintiff says the "maintenance of inoperative digital signs and changes to [the] sign structures" is a benefit of the settlement agreement.

In our view, the pertinent word is "inoperative." Plaintiff has not proven that the maintenance of digital displays that cannot be used, or the continued existence of the reinforced structures, provides any tangible benefit to real parties. Instead, real parties have invested in expensive equipment and structural reinforcements that are, respectively, inoperable and unnecessary, and now they must incur the expense of seeking permits for and reverting the signs to permissible static use. The only benefit we see is that real parties need not incur the further expense of removing the inoperative digital displays and tearing down the reinforced portions of the sign structures. But that benefit did not flow from the terms of the illegal settlement agreement. It occurred because real parties followed legal processes, with notice to the public and an opportunity to be heard, to obtain permits for significant modifications to the signs, to leave in place the turned-off digital sign faces to be used as backing and wrap them with vinyl messages.

In short, on the record in this case we can find no abuse of discretion in the trial court's enforcement of the writ.

## 2. The Attorney Fee Motion

Plaintiff sought attorney fees under section 1021.5. A filing in the trial court shortly before the January 21, 2014 hearing on fees showed fees incurred (including estimated fees for January 2014) of more than $3 million.

### a. The general legal principles

"[E]ligibility for section 1021.5 attorney fees is established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary, has been

16

conferred on the general public or a large class of persons," and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." ' "**4** (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 (*Whitley*), quoting *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 (*Woodland Hills*). " '[Utilizing] its traditional equitable discretion,' [the trial] court 'must realistically assess the litigation and determine, from a practical perspective' [citation] whether or not the statutory criteria have been met." (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142.)

The trial court's judgment on whether a plaintiff has proved each of the prerequisites for an award of attorney fees under section 1021.5 "will not be disturbed unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion." (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 170; *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 391 ["If the superior court's order is not consistent with the applicable principles of law, the order necessarily falls outside the scope of the superior court's discretion."].)

### b. The legal principle at issue in this case

In this case, there is no dispute that two of the three prerequisites for an award of fees under section 1021.5 have been met: plaintiff's lawsuit resulted in the enforcement of an important right affecting the public interest, and conferred a significant benefit on the general public. The dispute is over whether the trial court abused its discretion when it concluded plaintiff did *not* prove the third prerequisite: namely, that "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." (§ 1021.5.)

The Supreme Court has given us direction on the meaning of " 'the financial burden of private enforcement.' " (*Whitley, supra,* 50 Cal.4th at p. 1214.) "[C]ourts have long construed this language to mean, among other things, that a litigant who has a

---

**4** A fourth requirement, not applicable here, is that "such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)

17

financial interest in the litigation may be disqualified from obtaining such fees when expected or realized financial gains offset litigation costs." (*Whitley,* at p. 1211.) *Whitley* further explains that "the purpose of section 1021.5 is not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Ibid*.)

" ' "[A]n award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]" (*Whitley, supra,* 50 Cal.4th at p. 1215; see also *California Licensed Foresters Assn. v. State Board of Forestry* (1994) 30 Cal.App.4th 562, 570 (*California Licensed Foresters*) ["our concern under section 1021.5 is whether [the plaintiff] 'had an *individual stake* that was out of proportion to the costs of litigation . . . , not whether [it was] financially able to bear the costs. Financial status is not the criterion' "].)

### c.   The trial court's ruling

The trial court concluded that the litigation vindicated an important public right, and conferred a significant benefit on the general public. But the court did not find the litigation imposed a financial burden that was out of proportion to plaintiff's individual stake in the matter. Instead, the court concluded that plaintiff had an "enormous" personal stake in this litigation. The court found the evidence showed plaintiff believed it would be ruinous for its business if it could not compete with real parties in the digital billboard industry as a result of the settlement agreement. The court found the public benefit bestowed by this litigation was only incidental to plaintiff's stake in getting a level playing field to compete in a very lucrative business, and therefore denied the motion.

18

### d. The record

The record on which the trial court based its ruling included the following evidence.

A declaration from Mr. Kouba, plaintiff's principal owner, dated June 2007, stated that the city's settlement agreement with real parties "puts [plaintiff] at a competitive disadvantage to these competitors because [plaintiff] is being prevented from upgrading to this new technology, while [real parties] are freely allowed to do so." Mr. Kouba further stated that digital displays were more attractive to advertising buyers, and preventing plaintiff from upgrading to digital displays "will injure [plaintiff's] business goodwill because [plaintiff] is not able to offer the latest technology that these competitors are able to offer. While it is difficult to quantify the nature and extent of this injury at the present time, [plaintiff] is clearly being placed at a competitive disadvantage and being severely injured in its business by the City's grant of special rights to its competitors."

Plaintiff's January 2008 second amended complaint in federal court against the city and real parties alleged that unless the city was restrained from applying the sign ordinances in a discriminatory fashion, plaintiff "will be irreparably injured" and "will suffer substantial loss of rents, profits and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain . . . ."

Mr. Kouba's June 2008 declaration in support of plaintiff's request for a preliminary injunction stated that plaintiff desired to build new signs throughout the city, but was prohibited from doing so because of the sign ban, and this "has caused and continues to cause irreparable injury to [plaintiff's] business, goodwill, and its right to free speech," an injury that "is impossible to quantify and damages alone will not make [plaintiff] whole." "This irreparable injury will grow each day until and unless the City is enjoined from continuing to enforce its unconstitutional ban against [plaintiff]."

At his July 2008 deposition, Mr. Kouba stated: "I see our action as – as trying to preserve or restore our – our civil rights and to build our company in a way that our competitors have been allowed to."

19

In a November 2008 pleading in this case, plaintiff pointed out that its interest was greater than that of the public at large, because it "is an outdoor advertising company whose *economic survival* depends on its signs, and fair competition and compliance with the law by other sign companies in Los Angeles."

In a July 2009 pleading, plaintiff asserted that each of real parties' digitized signs can generate approximately $1 million per year in advertising revenue.

In addition, as further evidence of plaintiff's financial interest in the litigation, real parties proffered a letter from plaintiff's counsel dated October 2, 2008, a month or so after filing this lawsuit. In the letter, plaintiff proposed a structure for a "global settlement" under which real parties would each pay plaintiff $5 million; would each assign to plaintiff 25 of the modernization credits (permitting digital displays) they obtained under the settlement agreement; and would support plaintiff's effort to obtain its own settlement with the city. In return, plaintiff would dismiss both this suit and the federal suit it had filed, withdraw a public records request, and agree to a mutual release and covenant not to sue.

In the October 2, 2008 letter, plaintiff said that its goal in this litigation was "not to injure [real parties] or the off-site sign business in Los Angeles," but rather "to obtain rights which are functionally equivalent to its competitors." Plaintiff stated it had been "heavily burdened and damaged by this unfair competitive advantage enjoyed by [real parties]," and without a global settlement, "[plaintiff] has no option than to level the playing field by challenging the settlement agreement in court." "A better option than bringing down the current regulatory structure (including the settlement agreement) is to craft an agreement that permits [plaintiff] to continue to do business in the same manner as [real parties]."[5]

---

[5]    Plaintiff contends in its reply brief that Evidence Code section 1154 prohibited the trial court from considering plaintiff's October 8, 2008 letter offering to settle the litigation for $10 million (and 25 modernization credits from each real party). We see no merit in this claim, as section 1154 does not prevent the admission of settlement letters when they are proffered for a purpose other than proving the invalidity of the claim under negotiation. Section 1154 provides that evidence "that a person has . . . offered . . . to

Plaintiff presented declarations to the trial court indicating that, when it filed this lawsuit, "the odds against [plaintiff] were very long." Mr. Kouba told the trial court that plaintiff has not benefitted financially from this lawsuit, and never expected to do so. He stated that neither he nor plaintiff "have received or will receive any monetary or special damages, sign permits, or other rights from this lawsuit." He told the trial court that it is not possible "to quantify the financial value to [plaintiff] of being treated equally under the law," and the uniform application of the law "confers [plaintiff] with no special advantages in the billboard industry or other tangible financial benefits to its business."

### e. Contentions and conclusions

On appeal, plaintiff contends there is "a complete lack of evidence that [plaintiff] stood to ever gain anything by seeking mandate." Plaintiff contends that pecuniary benefits must be "direct and certain" to disqualify a litigant from obtaining fees. At its core, plaintiff's position is that it sought no monetary damages, and therefore its "reasonably expected financial benefits" when it undertook this litigation were "none, too indirect, and/or unascertainable." Plaintiff also asserts that the trial court erroneously denied fees on the rationale that plaintiff "is in the billboard business and had financial resources to pay lawyers." Neither assertion has merit.

The latter contention is plainly mistaken. The trial court's discussion at the hearing shows it was well aware of the legal standard applicable to the financial burden requirement: namely, whether the litigation imposed a financial burden that was out of proportion to plaintiff's individual stake in the matter. Plaintiff's suggestion that the trial court's ruling was based on plaintiff's ability to pay or on plaintiff's lack of altruistic

accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it." Here, the letter was not admitted to prove the invalidity of any of the claims plaintiff offered to settle, but rather for the limited and entirely different purpose of assessing the financial burdens and incentives under the private attorney general statute. (See *Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1479 [letters proposing compromise "were not offered to disprove the merits of the claim under negotiation, but rather 'to show the invalidity of a different claim' "].)

21

motives has no support in the record. The court correctly focused on plaintiff's "objective financial incentives," as *Whitley* directed. (*Whitley, supra,* 50 Cal.4th at p. 1221 ["objective financial incentives and subjective motives may overlap, and indeed sometimes may be indistinguishable," but "it is clear from the language and purpose of the statute that only the former is the proper subject of the court's inquiry when assessing the financial burden of litigation under section 1021.5"].)

Nor do we agree with plaintiff's contention that its "reasonably expected financial benefits" when it undertook this litigation were "zero," or that the trial court erred in failing to "apply the *Whitley* test" for weighing costs and benefits.

The test plaintiff cites is a method for weighing costs and benefits that *Whitley* endorsed, quoting with approval from *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Los Angeles Police Protective League*). In that case, the Court of Appeal explained that the trial court must first estimate the monetary benefits obtained by the successful litigants; discount those benefits by some estimate of the probability of success when litigation decisions were made; then place that estimated value of the case beside the actual cost of the litigation "and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved" in the case. (*Whitley, supra,* 50 Cal.4th at pp. 1215-1216, quoting *Los Angeles Police Protective League*, at pp. 9-10.)

*Los Angeles Police Protective League* concluded that " '[a] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Whitley, supra,* 50 Cal.4th at p. 1216, quoting *Los Angeles Police Protective League, supra,* 188 Cal.App.3d at pp. 9-10.) Applying this test, plaintiff, maintaining its odds of success were "10 percent at most," contends that when its benefits ("zero") are discounted for a 10 percent probability of success and compared to costs of $3 million, the financial burden requirement is obviously met.

We reject plaintiff's analysis, which depends on the proposition that the *Whitley*-endorsed test enunciated in *Los Angeles Police Protective League* for weighing costs and

22

benefits must be applied literally in every case, and on the equally dubious proposition that the absence of a monetary award necessarily equates to "zero" financial benefits. *Los Angeles Police Protective League* involved specific financial benefits – "the litigant's own monetary award" – to be weighed against litigation costs. Not all cases involve a monetary award. Indeed, *Whitley* itself did not.

The issue presented and resolved in *Whitley* was "whether *nonfinancial, nonpecuniary* personal interests in the litigation, such as vindicating the best interests of a child or sibling, can *also* serve to render a litigant ineligible for attorney fees . . . ." (*Whitley, supra,* 50 Cal.4th at p. 1211, italics added.) The answer to that question was "no," because the purpose of section 1021.5 "is not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation *when there are insufficient financial incentives to justify the litigation in economic terms*." (*Whitley*, at p. 1211, italics added; see *Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 407 ["the issue in *Whitley* did not concern the appropriate test for weighing financial costs against financial interests"].)

In short, we reject plaintiff's contention that *Whitley* required the trial court here to find that its financial incentive was "zero," because it sought no monetary award, or that the trial court erred in failing to compare "zero" with the $3 million cost of the lawsuit. *Whitley* did not address (nor did *Los Angeles Police Protective League*) circumstances where the plaintiff seeks no monetary award, but where his or her only "individual stake in the matter" is nevertheless solely financial. Nor does *Whitley* say that a plaintiff's financial incentive must be "direct."

Cases which *have* addressed circumstances where a plaintiff with a financial interest seeks no monetary award demonstrate that the trial court here understood the law on the "financial burden of private enforcement," and did not abuse its discretion in applying those principles. (*California Licensed Foresters*, *supra*, 30 Cal.App.4th at p. 570 [plaintiff, a nonprofit association representing professional foresters, had a financial stake to the same extent as its members, as its "very existence depends upon the

23

economic vitality of its members and any benefit or burden . . . ultimately redounds to the membership"]; *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 510 (*Arnold*) [plaintiff, a former harness racing operator whose lawsuit resulted in the defendant's rescission of a harness racing contract between the defendant and another operator, resulting in $1.6 million in additional public revenues, was not entitled to fees because rescission " 'gave [plaintiff] the opportunity to compete for a potentially lucrative future public contract with [the defendant].' ")

*Arnold* and *California Licensed Foresters* confirm that the absence of a monetary award, or of precise amounts attached to financial incentives, does not prevent a court from determining whether the plaintiff's financial burden in pursuing the lawsuit is " ' "out of proportion to his individual stake in the matter." [Citation.]' " (*Woodland Hills, supra,* 23 Cal.3d at p. 941.)  The trial court is not required to (and indeed may not) take financial incentives out of the calculation, or conclude there are none, simply because the plaintiff sought no monetary award in the litigation.

Plaintiff cites other cases where Courts of Appeal found no abuse of discretion in the award of fees by trial courts, concluding, for example, that the plaintiff's "future money advantage . . . is speculative" (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1127), or that the plaintiffs' " 'pecuniary benefit will be indirect and uncertain' " (*Monterey/Santa Cruz County Bldg. & Const. Trades Council v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1523).  But those cases, like all others, depended on the facts before the trial court, and in each case the court of appeal found no abuse of discretion.  The cases do not support the proposition that, in this case, plaintiff's financial interest was "speculative" or "uncertain."  The trial court found to the contrary, that plaintiff's financial interest was "enormous," and the evidence supported that assessment.

In sum, the inquiry before the trial court here was whether there were "insufficient financial incentives to justify the litigation in economic terms." (*Whitley*, *supra*, 50 Cal.4th at p. 1211.)  As *Whitley* observed, section 1021.5 " 'is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in

24

the outcome is insufficient to warrant incurring the costs of litigation.' " (*Whitley*, at p. 1221, quoting *Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 78 [holding the plaintiff's personal financial stake was not so disproportionate to the cost of litigation that the lawsuit would not have been brought without the additional incentive of an award of attorney fees].)  The record supports the trial court's conclusion that plaintiff had a personal financial stake in this litigation that was sufficient to warrant its decision to incur significant attorney fees and costs in the vigorous prosecution of this lawsuit.

## DISPOSITION

The orders are affirmed.  Real parties shall recover their costs on appeal.


GRIMES, J.

WE CONCUR:


RUBIN, Acting P. J.


FLIER, J.

25