Filed 4/18/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>INVESTCO MANAGEMENT &<br>DEVELOPMENT LLC et al.,<br><br>    Defendants and Appellants. | A143307, A143406<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-11-507316) |

## I.    INTRODUCTION

These consolidated appeals challenge the award of attorney fees to respondents Kim Agasaveeran and Jeffrey Bryant (respondents) under Code of Civil Procedure section 1021.5 (section 1021.5). Respondents specially appeared in an already-settled securities fraud action brought by the Commissioner of the Department of Business Oversight (DBO) against real estate investment company Investco Management & Development LLC (Investco M&D) and its promoters, Christopher P. Epsha, Steven G. Thompson, Barry D. LeBendig, and Douglas R. Hanson (the promoters). Respondents— victims of the securities fraud—successfully opposed a motion that would have stayed all individual actions by them and other defrauded investors against these defendants. Respondents also raised several issues concerning the fairness of the settlement, resulting in substantive changes to the stipulated interlocutory judgment and special master order in the DBO action.

We conclude the trial court did not abuse its discretion in finding that respondents: were successful parties against the DBO, Investco M&D and the promoters; enforced an important right affecting the public and a large group of securities fraud victims; and

1

provided necessary, non-duplicative, and significant benefits to this group of investors, while incurring litigation expenses that were out of proportion to their personal interests. Accordingly, we affirm.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Investco M&D and the promoters offered and sold memberships in numerous Investco AV limited liability corporations (Investco AV LLCs) to the public through trade shows and fairs throughout California.  According to the DBO, these membership interests constituted "securities" within the meaning of the Corporations Code but were sold without qualification or exemption from qualification by the Department of Corporations.  Investco M&D and the promoters represented to prospective investors that the investment funds would be used to purchase specific real property in rural Los Angeles County at a favorable price.  However, Investco M&D and the promoters failed to disclose that for each of the Investco AV LLCs, there was a corresponding Landco LLC that had purchased the same property only weeks or months before for a substantially lower price and sold the properties to each Investco AV LLC, resulting in undisclosed profits to Investco M&D and the promoters.  This scheme reached 443 investors and raised approximately $22,725,000.  In February 2009, the DBO issued a desist and refrain order against Investco M&D, Epsha and Thompson, directing them to immediately refrain from offering or selling securities and from making any material misrepresentations or omissions about these securities.

### A.  The DBO Action

In January 2011, the DBO filed a civil action against Investco M&D, the promoters, and several Investco AV LLCs for violations of the Corporate Securities Law of 1968 (CSL) and the February 2009 desist and refrain order.  The DBO sought to enjoin these defendants from any further selling of unregistered limited liability membership interests in numerous Investco AV LLCs, restitution for the individual investors who were harmed, disgorgement of profits, and civil penalties.  In June 2011, the DBO obtained a preliminary injunction that prevented Investco M&D, the promoters, and named Investco AV LLCs from selling, transferring, or otherwise disposing of the real

property owned by the LLCs without court approval and from using the LLC bank accounts for anything other than property management and development.

In May 2012, the DBO action settled. Under the confidential settlement agreement, Investco M&D, the promoters, and the named Investco AV LLCs agreed to a permanent injunction enjoining them from: offering to sell or selling any security of any kind, including interests in the LLCs, unless such securities are qualified or exempt; offering or selling any security by means of written or oral communications that contain untrue statements of material fact or omit to state material facts; and violating the February 2009 desist and refrain order. In exchange, the DBO released these defendants from all claims that were or could have been brought by the DBO. On May 14, 2012, the trial court (Hon. Harold Kahn) entered the stipulated interlocutory judgment.

In January 2013, the trial court (Hon. Marla J. Miller) appointed James H. Donell as special master to monitor and approve the sale of the real properties held by the LLCs. Under the appointment order, any development plan or sale of property had to be approved by the special master based on his good faith belief that the sale or development plan was in the best interests of the investors of the Investco AV LLCs. The special master's duties did not involve the day-to-day management or development of any Investco AV LLC property or day-to-day management of Investco M&D.

In March 2013, the DBO sent notices of the settlement to approximately 443 investors in the Investco AV LLCs, including respondents. In August 2013, respondents each filed civil actions against Investco M&D, the promoters, the Investco AV LLCs, and various entity and individual defendants, asserting causes of action for the unlawful offer and sale of unqualified non-exempt securities, material misrepresentations and omissions in the offer and sale of securities, fraud and deceit, and various torts including negligence, conversion, and breach of fiduciary duty.[1]

---

[1] The DBO's request for judicial notice of respondents' complaints is granted. (Evid. Code, § 452, subd. (d).) The complaints largely mirror one another, with the main difference being the named defendants. In Agasaveeran's complaint, the defendants are Investco M&D, the promoters, Investco AV20 and AV21, and Skyfusion AV18 LLC,

3

In December 2013, Investco M&D, the promoters, and several Investco AV LLCs (the moving defendants) moved to amend the interlocutory judgment to stay all actions against them arising out of the subject matter of the settlement agreement pending completion of their obligations under the settlement agreement. The moving defendants argued that if respondents obtained the relief they sought in their individual actions, the Investco AV20 and AV21 LLCs would almost certainly be forced to sell their real estate holdings at reduced prices to satisfy the judgments, which would interfere with the terms of the settlement, give respondents far more than their pro rata share of the assets owned by the LLCs in which they invested, and create a shortfall for the remaining Investco AV20 and AV21 LLC investors.

The DBO filed a written joinder to the moving defendants' motion, "adopt[ing] the request and memorandum of points and authorities and supporting documents filed therewith." Additionally, the DBO argued that "[i]f the two individual investors who have recently filed their own separate civil actions . . . are allowed to proceed with their own actions before the Special Master has completed his oversight and review of real property sales and distribution of proceeds, these particular investors advance their own interests at the expense of all investors." The DBO stated that "[i]n the interests of promoting the interests of each and all investors equally, and without favoring one investor over another, the Commissioner joins in the Defendants' Motion to Modify the Interlocutory Judgment to enjoin investors, . . . and all other persons or entities from seeking from defendants relief of any kind, in law or in equity, creating or enforcing a lien upon any real property, or the doing of any act or thing whatsoever to interfere with the oversight, control, or management of the special master during the course of his appointment in this action and until the filing of Final Judgment."

Respondents filed a "special appearance" as "interested parties" in opposition to the motion to modify. They argued that they were involuntarily bound by the settlement

_____

while the defendants in Bryant's complaint are Investco M&D, the promoters, Investco AV21, Dareld Phillips, Sr., and Bonnie Phillips.

4

agreement and were denied due process because they received no notice of the settlement nor any opportunity to be heard, object, or opt out. They further argued that the settlement agreement was unduly favorable to Investco M&D and the promoters because it permitted them to retain the fruits of their fraud and allowed them to remain in control of the underlying properties and investment vehicles, subject to limited oversight. Respondents further contended the settlement agreement was unfairly punitive against them because it limited their income, restricted their damages, modified their private contractual relations, forced them to be involuntary partners with the promoters, and replaced their right to legal recourse with a revocable, unsecured personal "guarantee" of 70 percent return on their principal investment. Respondents further argued that a forced liquidation of the underlying properties would not necessarily result because the promoters were personally liable for respondents' damages, and respondents were also seeking rescission, which would revest title in the underlying properties back to the moving defendants.

The trial court (Hon. Ernest H. Goldsmith) held three lengthy hearings on the motion, which we summarize below.

### 1. The March 7, 2014 Hearing

During the first hearing, the trial court immediately expressed concerns about several aspects of the settlement. The court stated that the LLCs' assets "can be dissipated" while the investor actions were stayed, leaving them with "thin air to go against." Respondents' counsel, Val Hornstein, added that his clients would be left with "an unsecured promise by crooks" to try to make a 70 percent return to his clients while they maintained control of the LLCs' properties. The trial court responded, "I'm very queazy [sic] about it, going along with this. I think the State is in it, and that was highly persuasive. It could be highly persuasive to the Court to approve it." The trial court went on to voice concerns about the promoters managing the properties, referring to this as a "fox in the hen house problem," and positing whether it would be better to appoint a receiver. The DBO's counsel, Edward Shinnick, responded that although the DBO "take[s] no position" on the "LLCs' [being] managed by the bad guys," a receivership

5

would add expenses for the investors, so it was more economical for the special master to oversee the promoters.

The court also questioned Mr. Hornstein about whether his clients would receive an unequal share of the proceeds relative to the other investors if the individual actions moved forward. During this discussion, the trial court observed, "There could be a class action here. . . . Somebody could have filed a class action." Mr. Hornstein responded, "It could have been, but that's not the case." Mr. Hornstein went on to argue that the settlement agreement "overrides [his clients'] private contract rights, and that cannot be done constitutionally either. . . . [I]t makes my clients involuntary partners with crooks. They have a right to rescind those contracts. The Department is not seeking recission [sic]. It is seeking to enjoin their conduct, and then allow them to manage the property and give an unsecured promise of a 70 percent return."

The trial court later commented, "I'll tell you what I'm concerned about. It's the fox in the hen house kind of thing that concerns me, and also no one has addressed the Constitutional issue that Mr. Hornstein has raised." In response, Mr. Shinnick argued that because the DBO action was not a class action, there were no due process procedures involved. "We're a regulatory body. We never appeared in here as a body representing the investors. We're looking out for the best situation for all investors, just like the SEC is." The court responded, "I have to tell you, if the State wasn't in this, I would have lit a match to the papers."

### 2. The April 4, 2014 Hearing

During early remarks at the second hearing, the trial court stated that it was "not inclined to grant the modification of the interlocutory judgment in the present form that it has taken" and questioned why it would not be viable to allow the lawsuits to go forward against the promoters. The trial court also questioned the limited nature of the special master's powers. "He's supposed to see that . . . the promoters, who would still be in charge and have the key, don't loot Investco. And that's about all the power he has. . . . And it's left up to the promoters to run the show. You know, I mean, here the State took

6

this extraordinary action, closed them down— . . . took them over, and the same people are going to run the show. I mean, there's a disconnect there, and I don't get it."

The trial court also recognized that because the DBO action was not a class action on behalf of the investors, there was no reason to provide investors with the ability to opt out. Mr. Hornstein responded, "the due process issue here . . . is that . . . you cannot bind non-parties to a settlement agreement." After Mr. Hornstein called the DBO action an "attempt to craft a class action settlement without due process rights," the trial court responded, "They didn't. . . . But I still will tell you there's an equity issue."

The trial court continued to question Mr. Hornstein on whether his clients' actions could harm the interests of the other investors. The court further commented, "I may send you back to the drawing board, but in the present form of this, I find it very hard to approve. That's not saying that there might be something I'd approve, but it's pretty obvious that I am highly reluctant to approve this."

The trial court again raised concerns over the lack of notice to the investors, saying "there is a due process issue here. I don't know why people didn't get notice. . . . I appreciate the due process issue. I think that if there had been notice, you probably would have a class action with all the protections that go along with that. [¶] I'm trying to think of what you can do if I send you back to the drawing board. If this is take-it-or-leave it, I'm not going to take it." Mr. Hornstein offered the suggestion to modify the complaint to make it a class action and represent all of the plaintiffs in one action. However, Alan Sparer, the moving defendants' attorney, raised questions about the viability of a class action given the differing circumstances of the individual investments. The DBO also argued that a class action was not a good solution because the LLCs would pay the class attorney's fees, lowering the return to each investor. The trial court agreed, but stated that a class action is "always a fallback."

The trial court once again raised the option of appointing a receiver and commented that "no one has ever told me how expensive it would be, why is that not appropriate." Mr. Sparer explained that "the thinking about keeping the promoters in was that part of the settlement was that they were guaranteeing that they would be liable for

7

shortfalls that occurred in returning investors their money. [¶] So the idea was to incentivize them to put in efforts for which you might have to pay somebody else a lot of money." The court responded, "I don't find that highly persuasive. [¶] I am also concerned about their good intentions to pay the differential if the money that they made on this deal by selling to the LLCs is dissipated or it's somewhere else or it's in aunt Martha's bank account."

At the end of the hearing, the trial court directed the DBO to submit further briefing regarding a new plan for management of the two LLCs' properties as well as a summary of the financial history.

### 3. The May 19, 2014 Hearing

At the third and final hearing on the motion, the trial court reiterated its concerns that respondents would "step in front of" the other investors. Mr. Hornstein continued to attack the settlement agreement and the lack of notice to the investors, leading the trial court to comment, "This should have been a class action." The trial court also expressed concerns about "cutting off [the investors'] rights to sue."

The trial court also stated that the DBO's further briefing was sort of the same recital and that the court still did not "know what the financial situation of the promotors is. You know, I did look at some of these cost figures, and what they paid for this land, and then what they sold it to the LLCs for. So I mean, they made some serious money there. Where is it?"

The trial court also continued to attack the unsecured promise of a 70 percent return. "This is illusory, sir. It's illusory, Counsel. We don't know, we haven't the faintest idea if they can make up the difference or any of it." "If they have assets, those assets can be in Bermuda by 2018. I mean, they already broke the law once. I don't know what they are going to do again. So that doesn't mean anything to me. It's illusory, the 70 percent. [¶] Because we don't know if they got two bits or they got money away somewhere; the State should have been mindful of that issue from the start. And that's a major default in this whole thing."

8

In the end, the trial court stayed respondents' actions as to the Investco AV LLCs, but allowed their actions against Investco M&D and the promoters to continue. The court further held that the special master would obtain full management and control of the LLCs and would make the final determination of when to liquidate them. On July 9, 2014, the court issued its final order granting in part and denying in part the moving defendants' motion to modify. The court also entered the amended interlocutory judgment and amended order appointing Mr. Donell special master.

**B. Respondents' Motion for Attorney Fees**

Respondents moved for attorney fees against the moving defendants and the DBO jointly and severally under section 1021.5. Respondents argued that through their efforts opposing the motion to modify, they obtained the right to immediately institute private litigation against Investco M&D and the promoters, removal of the promoters from any role in managing or operating the Investco AV LLCs and their properties or funds, a significant expansion in the special master's role such that he solely manages and operates the Investco AV LLCs, and an order tolling relevant statutes of limitation and/or repose.

At the September 9, 2014 hearing on the matter, the trial court stated: "I think [the investors] are in a safer position with the removal of the promotors. I feel that the result with the expanded powers of the Special Master was a good result. [¶] I think the alternative, the only alternative, would have been a class action, which would have involved more litigation, more expense. I think that there is a substantial savings to all involved with the kind of litigation that would ensue. [¶] Because I think it was a head-in-the-sand approach to think that this venture could proceed after the violation of California Securities Law by the promoters. As I said before, and I'll say it again, it was putting the fox in the henhouse. [¶] . . . [¶] I believe there was an enforcement of an important right affecting the public interest. I think a benefit was resulted, and not just on the 441 individual investors who were the people that need protection or assistance, if you will, but the public generally. [¶] I think the optics of this case go beyond its four corners because I think it says to those out there who might promote something along the

9

lines of the Investco promotors, that they cannot act with impunity; that no matter what kind of a deal they strike, there is going to be litigation that is going to presumably protect the public. [¶] So I think that the interested parties have met their burden under CCP 1021.5[.]"

Notably, the trial court stated the fee award would not be against the DOB. In response, Mr. Hornstein argued that it was because the DBO "joined with the defendants to shield the promotors" that private enforcement was necessary, and the DBO was responsible for the insufficient protections in the original settlement. Mr. Shinnick responded that the DBO joined in the motion to protect the settlement and increase the likelihood of maximizing recovery, but the court responded, "That was your leitmotif in this whole thing. [¶] . . . [¶] . . . I just disagreed with you all the way in your approach on this. I thought it was a recipe for disaster to have the promotors in charge of this." The trial court also mused as to whether "there's an opening here that if somehow that's not paid, then maybe the State should have to back them up. I don't know if I can do that."

The docket entry immediately following the September 9th hearing indicated that the motion for attorney fees was "granted against the promoters but not against the State." However, the September 24, 2014 order prepared by the court stated that attorney fees in the amount of $149,500 were payable "jointly and severally" by the DOB and the moving defendants. The order further held that the following benefits were achieved: "Preservation of the right of investors to bring lawsuits against the defendant promoters [from] . . . removing defendant promoters from financial and management control of the LLCs holding the real estate which was the subject of the fraudulent sales; expanded powers of a Special Master including management of the LLCs; Court supervision of the Amended Interlocutory Judgment; tolling of [the statute of] limitations for investors; and, avoiding the necessity of a lengthy and expensive class action lawsuit." The court further found "the necessity for private enforcement inasmuch as reliance on public enforcement, as structured prior to the intervention, would not have resulted in the enumerated benefits to the class" and that the fee award "is justified because the financial burden of private

10

enforcement would have prevented intervention by the Interested Parties and other investors."

**C. Appeal**

On October 8, 2014, the DBO filed a timely notice of appeal. (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1015–1016 [order granting motion for attorney fees qualifies as appealable collateral order].) On October 14, 2014, Investco M&D, Thompson and Hanson (the appealing defendants) also filed a timely notice of appeal. The appeals were consolidated for briefing, argument and decision.

## III.    DISCUSSION

Code of Civil Procedure "[s]ection 1021.5 codifies California's version of the private attorney general doctrine, which is an exception to the usual rule that each party bears its own attorney fees. [Citation.] The purpose of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases. [Citation.]" (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 390 (*Robinson*).)

The statutory language of section 1021.5 "can be divided into the following separate elements. A superior court may award attorney fees to (1) a successful party in any action (2) that has resulted in the enforcement of an important right affecting the public interest if (3) a significant benefit has been conferred on the general public or a large class of persons, (4) private enforcement is necessary because no public entity or official pursued enforcement or litigation, (5) the financial burden of private enforcement is such as to make a fee award appropriate, and (6) in the interests of justice the fees should not be paid out of the recovery." (*Robinson*, *supra*, 202 Cal.App.4th at p. 390, fn. omitted.)[2] "As section 1021.5 states the criteria in the conjunctive, each of the statutory criteria must be met to justify a fee award. [Citations.]" (*County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648.)

_____

[2] The sixth element is not applicable here because only injunctive relief was obtained.

11

### A. Standard of Review

" 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion.' " (*McGuigan v. City of San Diego* (2010) 183 Cal.App.4th 610, 622 (*McGuigan*).) " 'Whether a party has met the requirements for an award of fees and the reasonable amount of such an award are questions best decided by the trial court in the first instance. [Citations.] That court, utilizing its traditional equitable discretion, must realistically assess the litigation and determine from a practical perspective whether the statutory criteria have been met. [Citation.] Its decision will be reversed only if there has been a prejudicial abuse of discretion. [Citation.] To make such a determination we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fees and whether it applied the proper standards of law in reaching its decision. [Citations.]' " (*Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, 1405–1406 (*Crawford*).) However, "[w]here the material facts are undisputed, and the question is how to apply statutory language to a given factual and procedural context, the reviewing court applies a de novo standard of review to the legal determinations made by the trial court. [Citation.]" (*McGuigan*, *supra*, 183 Cal.App.4th at p. 623.)

The DBO and appealing defendants (collectively appellants) argue that de novo review is appropriate because the pertinent facts are undisputed and the issue on appeal is simply whether each element under section 1021.5 is met. We disagree, because the trial court resolved disputed contentions based on the facts and evidence before it to reach its decision. For instance, it found the investors were ultimately better off with a receivership rather than allowing the promoters to continue managing the underlying properties, a finding that appellants still dispute by arguing that the investors will receive a lower return than they otherwise would under the original interlocutory judgment. The trial court also considered financial information regarding the LLCs and the underlying properties in evaluating whether to continue to allow the promoters to manage the properties and/or expand the special master's powers. These are precisely the types of determinations best decided by the trial court in the first instance. (See *Crawford*, *supra*,

12

200 Cal.App.3d at pp. 1405–1406.) Thus, our review is simply to determine whether the result was within the range of the superior court's discretion. (*Robinson*, *supra*, 202 Cal.App.4th at p. 391.)

*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330 (*Karuk Tribe*) and *Center for Biological Diversity v. California Fish & Game Com.* (2011) 195 Cal.App.4th 128 (*Center for Biological Diversity*) are plainly distinguishable. In those cases, our colleagues in Division Two exercised independent review to reverse fee awards because the interim victories the plaintiffs obtained—remand orders that required administrative agencies to reconsider previously decided matters but did not result in a change in the ultimate decisions—did not satisfy the " 'successful' " party requirement as a matter of law. Here, respondents did not simply obtain an " 'augmented explanation' " for a decision that did not otherwise change the overall state of affairs. (See *Center for Biological Diversity*, *supra*, 195 Cal.App.4th at p. 131; *Karuk Tribe*, *supra*, 183 Cal.App.4th at p. 335.) Rather, their efforts resulted in substantive changes to the interlocutory judgment and special master's powers, and they averted a complete stay of their individual actions. It cannot be said that respondents were unsuccessful as a matter of law.

## B. Successful Parties in an Action

A successful party is one who " ' "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." ' [Citation.]" (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292.) To determine whether a party is "successful," courts look at the outcomes the parties sought in commencing the action, the situation before the party commenced the suit, and the situation today. (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 685, fn. 31.) In order to effectuate the policy of Code of Civil Procedure section 1021.5, courts take "a broad, pragmatic view of what constitutes a 'successful party.' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 (*Graham*).) Thus, "[a] party who satisfies the criteria for intervention and who contributes to the success of public interest litigation should be

13

entitled to an award of attorneys' fees on the same terms as any other party." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 87; see also *Crawford*, *supra*, 200 Cal.App.3d at p. 1407, fn. omitted [relying on federal decisional authority holding that interveners who make "a clear showing of some unique contribution to the litigation" may be entitled to fees under section 1021.5].) Furthermore, the limited nature of success does not preclude a fee award, but merely requires that the amount of the award be reduced accordingly. (*Weiss v. City of Los Angeles* (2016) 2 Cal.App.5th 194, 219 (*Weiss*).)

Appellants argue that because respondents did not formally intervene in the DBO action, they are not entitled to section 1021.5 attorney fees. Appellants cite our decision in *Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588 (*Savaglio*) for the position that an attorney fee award is not permitted under section 1021.5 where the party chose to file a motion instead of institute an action. In *Savaglio*, the defendant-retailer was sued for violating meal and rest break laws. During the litigation, the defendant filed records conditionally under seal without complying with California Rules of Court, rules 2.550 and 2.551. After a newspaper moved to unseal the records under rule 2.551(h),[3] the defendant filed a belated motion to seal, which the trial court granted in part. The trial court also denied the newspaper's request for attorney fees under section 1021.5. We reversed the trial court's order to the extent that it granted the motion to seal, but affirmed the denial of attorney fees to the newspaper. In doing so, we noted that the newspaper "did not file a complaint in intervention under Code of Civil Procedure section 387, and the court declined to find it a de facto intervener." (*Savaglio*, *supra*, 149 Cal.App.4th at p. 602.) We further held that because the motion to seal "was entirely unrelated to the objective of the lawsuit," the newspaper's success was an "ancillary part of the litigation." (*Id*. at p. 603.)

---

[3] This rule allows a "member of the public" to move to unseal a record. (Cal. Rules of Court, rule 2.551(h)(2).)

14

Unlike the newspaper in *Savaglio*, respondents were not strangers to the DBO action. The motion to modify the interlocutory judgment specifically targeted their civil actions by name and case number and sought to have the actions stayed. Appellants cite no authority requiring such clearly interested parties to formally move to intervene in order to obtain section 1021.5 fees, and under the circumstances presented here, we decline to require it. (See *Graham*, *supra*, 34 Cal.4th at p. 566 [procedural device used to enforce important right is not determinative of entitlement to section 1021.5 fees].) From a broad and pragmatic view, respondents' special appearance was the functional equivalent of intervention. While in *Savaglio*, we specifically noted that the trial court declined to find the newspaper to be a "de facto intervener" (*Savaglio, supra*, 149 Cal.App.4th at p. 602), here, the trial court referred to respondents as "the Intervenor[s], or call them 'Interested Parties' if you will" who "hired Mr. Hornstein to bring this intervention," and the trial court's final order also referred to respondents' special appearance as an "intervention."

Furthermore, unlike the newspaper's success on the motion to unseal in *Savaglio*, respondents' success was not "ancillary" or "entirely unrelated to the objective of the lawsuit." (*Savaglio*, *supra*, 149 Cal.App.4th at p. 603.) The interlocutory judgment and order setting forth the powers and duties of the special master comprised the core relief negotiated in the DBO action. The trial court sharply criticized this settlement structure in several respects, referring to one of the key terms as "illusory," and respondents were successful in causing substantive changes to be made to the settlement. These successes were related to the objective of the DBO action because, in the court's reasonable view, they provided better protections to the victims of the securities fraud.

Appellants also rely on *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc.* (2005) 127 Cal.App.4th 387 (*Consumer Cause*), disapproved on other grounds by *Hernandez v. Restoration Hardware, Inc*. (2018) 4 Cal.5th 260, 269, but we find *Consumer Cause* to be distinguishable. There, the court upheld the denial of section 1021.5 attorney fees to a putative class member who successfully objected to a proposed classwide settlement. The court held that the objector was not a successful party because

15

he merely "interposed objections that, while sustained, simply permitted the original parties to the lawsuit . . . to continue with their lawsuit as initially filed." (*Consumer Cause, supra,* 127 Cal.App.4th at p. 404.) Here, after the special appearance by respondents, the DBO and moving defendants did not simply continue on as before. Rather, they were subject to substantive changes in the settlement structure and control of the underlying properties.

Appellants contend that respondents were not successful parties relative to their main objectives in opposing the motion to modify because they did not obtain all the relief they sought, they did not obtain an immediate return of their investments, and the trial court implicitly rejected their constitutional/due process arguments. Appellants further argue that respondents cannot claim success for the additional investor protections because they never asked the court to amend the interlocutory judgment to remove the promoters from management and control or give the special master full control of the LLCs. Appellants claim it was the trial court who raised the "fox in the hen house" issue sua sponte.

We disagree with these points. Respondents successfully opposed a motion that would have completely stayed their respective individual actions. Comparing the situations before and after they took private action (see *Folsom*, *supra*, 32 Cal.3d at p. 685, fn. 31), respondents obtained part of the outcome they expressly sought. They did not, as appellants contend, affirmatively seek an immediate return of their investments; rather, they opposed a motion that, if granted, would have restrained them from continuing to litigate, and they partially prevailed. The limited nature of their success does not undermine their entitlement to fees (*Weiss*, *supra*, 2 Cal.App.5th at p. 219), and appellants do not contend that the fee award should have been further reduced to account for partial success.[4]

_____

[4] The DBO argues for the first time in its reply brief that we should grant a reasonable offset for the DBO's role in obtaining the amended orders so that respondents will not be compensated for results they did not seek. The DBO has waived this particular argument because it was not raised in the proceedings below or in appellants'

16

The trial court did not, as appellants contend, reject respondents' due process and constitutional arguments. Rather, the court repeatedly stated its concerns about due process, notice to the investors, and "cutting off their rights to sue." The court took these issues seriously, if not as a strict constitutional problem, then as an issue of fundamental fairness or "an equity issue" because, as Mr. Hornstein argued, the settlement agreement and proposed modifications threatened to impact the investors' rights and possibility of recovery.

The "fox in the hen house" concern that appellants credit solely to the trial court was first discussed in respondents' opposition brief. Respondents specifically argued that it was unfair to allow the promoters to remain in control of the underlying properties and to replace the investors' right to immediate legal recourse with a revocable, unsecured personal guarantee of 70 percent return on their investment. As recounted above, these arguments successfully resonated with the trial court. The expansion of the special master's role was a solution that logically stemmed from the problems briefed by respondents. Furthermore, the trial court stated that the benefits to the investors were "directly derived" from respondents' efforts and "never would have happened otherwise." The record amply supports the conclusion that respondents were " 'demonstrably influential' " in "prompting a change in the state of affairs" (*Karuk Tribe*, *supra*, 183 Cal.App.4th at p. 363), and as de facto interveners, provided a "unique contribution to the litigation." (*Crawford*, *supra*, 200 Cal.App.3d at p. 1407, fn. omitted.)

In its reply brief, the DBO argues that respondents cannot obtain fees because they failed to provide the DBO with prelitigation notice and an opportunity to settle the dispute. Besides improperly raising this argument for the first time in its reply brief, the DBO erroneously presumes that respondents seek attorney fees under a "catalyst theory." Under this theory, fees may be awarded "even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the

---

opening briefs. (*Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776–777.)

17

manner sought by, the litigation." (*Graham*, *supra*, 34 Cal.4th at p. 560.) However, in the proceedings below, the DBO did not change its behavior in a way that mooted judicial resolution. Rather, there *was* judicial resolution in the form of a partial denial of the motion to modify and court-approved changes to the interlocutory judgment and special master order. Because the circumstances here are not analogous to a catalyst theory, the lack of prelitigation notice is not a bar to section 1021.5 attorney fees. (See *Vasquez v. State of California* (2008) 45 Cal.4th 243, 260.) We conclude the trial court did not abuse its discretion in finding respondents to be successful parties.

### C. The DBO Was an Opposing Party

"[O]nly an opposing party can be liable for attorney fees under section 1021.5." (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1176.) "An 'opposite party' means '[a]n adversary in litigation.' [Citation.] Thus, we construe the term 'opposing party' as used in section 1021.5 to mean a party whose position in the litigation was adverse to that of the prevailing party. Simply put, an 'opposing party' within the meaning of section 1021.5 is a losing party." (*Nestande v. Watson* (2003) 111 Cal.App.4th 232, 240–241 (*Nestande*).) "[A] public entity may be held liable for attorney fees only if the agency or its representatives was an 'opposing party' in the litigation." (*Id*. at p. 240.)

The DBO argues it was not an opposing party because its interests were always aligned with the investors. Procedurally however, the DBO stood on the opposite side of respondents on the motion to modify, and the DBO's original alignment of interests with the investors was not dispositive. (See *McGuigan*, *supra*, 183 Cal.App.4th at p. 618 [settlement of class action "fundamentally changed the original positions" of parties from adversaries to allies against objectors].) Although the DBO originally acted in the interests of all investors when it sued Investco M&D and the promoters, it fundamentally changed positions relative to respondents when it joined in the moving defendants' effort to stay their individual actions.

The DBO argues it was not an opposing party because it merely filed a joinder in the motion to modify, did not file a reply brief after respondents specially appeared, and

18

simply sought the court's guidance, without taking a position adverse to respondents. The DBO cites *Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614 (*Wal-Mart*) in support. There, the public entity did not oppose a petition for writ of mandate or take a legal position adverse to the real parties in interest. (*Id.* at p. 625.) Rather, the public entity and city clerk filed its response, in which they sought the court's guidance on the proper verification of petition signatures, and the city's counsel only spoke briefly at the hearing. (*Ibid.*) As for the other real party in interest in *Wal-Mart* who filed a written joinder to the petitioning party's papers, the court found that it was not an opposing party because it simply filed the joinder and made no arguments at the hearing. (*Ibid.*)

In contrast, the DBO filed a written joinder that not only adopted the request, arguments, and supporting documents filed by the moving defendants, but included additional arguments and legal authorities in support. Practically speaking, the DBO, in advocating a stay of all investor actions, took a legal position adverse to respondents. Thereafter, the DBO was actively involved in oral argument at all three hearings. Even if the DBO's dialogue with the court could be characterized as seeking the court's guidance, this posture developed after the court expressed reservations about granting the motion and pressed all of the participants for alternative ideas. The DBO's initial position was fully in favor of the motion being granted, and its efforts to modify the settlement in a way that satisfied the court's concerns was necessary to avoid a complete loss. As the trial court stated, "If this is take-it-or-leave-it, I'm not going to take it." Although the DBO submits that its motive was always to protect all of the investors—a "leitmotif" that the trial court disagreed with—the DBO still acted on that motive in a manner that was adverse to the position of respondents in the procedural and factual context of the motion to modify.

The DBO argues that the trial court's final order on the fee motion makes clear that the real dispute was between the moving defendants and the investors. However, a realistic and practical assessment of respondents' success requires us to look at not just the final order but the entire factual and procedural context discussed above. Although

19

the trial court was initially inclined to award fees only against the moving defendants and not the DBO, we assume the trial court changed its mind based on the arguments made at the September 9th hearing, including Mr. Hornstein's point that the DBO was responsible for the identified problems in the settlement agreement that were eventually addressed after several rounds of hearings and submissions.

Citing *Nestande*, *supra*, 111 Cal.App.4th at p. 242, the DBO argues that section 1021.5 was never intended to allow private parties like respondents to intervene in government enforcement actions, claim disagreement with the agency's discretionary actions, and then use the public treasury as compensation. In the cited portion of *Nestande*, however, the court rejected an argument that section 1021.5 attorney fees should be paid by a public entity who allegedly failed to vigorously defend a ballot issue in court, but was *not an opposing or losing party* for section 1021.5 purposes. (*Ibid.*) Here, the DBO was an opposing party in relation to respondents in the motion to modify proceedings.

Finally, the DBO argues that to the extent the trial court awarded attorney fees against the DBO to "back [the promoters] up" in the event of bankruptcy, this was improper. However, we will assume the DBO was included in the final order because the statutory bases for the award of section 1021.5 fees were satisfied, not based on the trial court's offhand comment.

**D. Enforcement of an Important Right Affecting the Public Interest**

Section 1021.5 permits a fee award " ' " 'in any action which has resulted in the enforcement of *an important right affecting the public interest*' regardless of its source—constitutional, statutory or other.' " [Citation.]' " (*Weiss*, *supra*, 2 Cal.App.5th at p. 218.) "Although section 1021.5 provides no concrete standard or test against which a court may determine whether the right vindicated in a particular case is sufficiently 'important' to justify a private attorney general fee award, the statutory language and the pertinent federal authorities provide at least some guidance in this area. First, . . . the broad statutory language and the federal precedents indicate that a right need not be constitutional in nature to justify the application of the private attorney general doctrine;

20

. . . [¶] Second, the Legislature obviously intended that there be some selectivity, on a qualitative basis, in the award of attorney fees under the statute, for section 1021.5 specifically alludes to litigation which vindicates 'important' rights and does not encompass the enforcement of 'any' or 'all' statutory rights. Thus, again like the federal cases, the statute directs the judiciary to exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 (*Woodland Hills*).)

The general purpose of the CSL is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon. (*People v. Rankin* (1958) 160 Cal.App.2d 93, 96; see also *People v. Martinson* (1986) 188 Cal.App.3d 894, 899 [intent behind Corp. Code, § 25530 was to create governmental cause of action to protect investing public].) In its complaint against Investco M&D, the promoters, and the Investco AV LLCs, the DBO stated that it was bringing the action "in the public interest in the name of the People of the State of California." The securities fraud scheme at issue targeted the investing public in California and reached hundreds of individual investors, raising approximately $22,725,000. Thus, the statutory rights under the CSL enforced here were important and affected the public interest.

The DBO argues that respondents did not enforce any such rights in relation *to the DBO* because the only CSL violations at issue were those of the moving defendants. However, as discussed above, the DBO was an "opposing party" in this context because it stood on opposite sides of respondents in the context of the motion to modify. During these proceedings, the trial court took seriously the concerns raised by respondents about due process, lack of notice to the investors, and "cutting off their rights to sue," and criticized the settlement terms negotiated by the DBO. Even if these matters did not rise to the level of strict constitutional violations, the trial court reasonably concluded that the efforts of respondents strengthened the settlement in ways that were important to hundreds of victims of securities fraud.

21

*Consumer Cause* and *Karuk Tribe* are distinguishable in that they involved procedural successes that did not result in any substantive changes. In *Karuk Tribe*, the fee claimants simply obtained a court order requiring a regional water quality control board to provide an "augmented explanation" on the same decision it had previously made. (*Karuk Tribe*, *supra*, 183 Cal.App.4th at p. 369.) In *Consumer Cause*, the fee applicant's successful objection to a class action settlement simply "[f]ree[d] [the] putative class members from the constraints of a proposed settlement agreement they had the right to disregard by exercising their opt-out right." (*Consumer Cause*, *supra*, 127 Cal.App.4th at p. 404.) In contrast, respondents obtained actual, substantive changes to the interlocutory judgment and special master's powers that, in the trial court's reasonable estimation, better protected hundreds of victims of securities fraud. The trial court did not abuse its discretion in finding that an important public right was enforced.

### E. Significant Benefit to the General Public or Large Class of Persons

"[T]he 'significant benefit' that will justify an attorney fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills*, *supra*, 23 Cal.3d at p. 939.) In adjudicating a motion for attorney fees under section 1021.5, a trial court should "determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.* at pp. 939–940.)

The record supports the trial court's finding that significant benefits resulted to a large class of persons and the public. These benefits included: the removal of the promoters from management and control of the LLCs, the expansion of the special master's powers, the preservation of the investors' rights to sue the promoters, and the deterrent effect or "cautionary message" to other promoters of similar securities. (See *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 246 [significant benefit where litigation had deterrent effect against similar violations].) As discussed above, we

reject appellants' argument that the additional investor protections and expansion of the special master's powers were not causally related to respondents' efforts.

Appellants argue that the special master's expanded powers do not confer a significant benefit to the investors because each investor is now expected to receive a lower return than they otherwise would have received under the original interlocutory judgment. In appellants' view, the promoters had more of an incentive than the special master to sell the property at the highest price because the promoters were not compensated for their efforts and wanted to avoid personal liability. However, appellants cite no evidence in the record supporting the conclusion that the investors will receive a lower return under a receivership, and we see nothing unreasonable in the trial court's contrary view that the promoters could not be trusted to control the LLCs and the underlying properties. It appears the court never obtained the evidence it requested regarding the purportedly high costs of a receivership, and the trial court was justifiably suspicious of the unsecured promise of a 70 percent return given the facts and history of the case. Nothing in this record demonstrates the trial court acted unreasonably in concluding that the investors significantly benefitted from having more trustworthy management of the underlying properties.

Appellants argue that allowing investor actions to proceed against the promoters is not a significant benefit because it only benefits respondents. Even so, we conclude the other investor protections would sufficiently support the significant benefit element.

Finally, appellants argue that respondents deserve no credit for avoiding class action litigation when it was their counsel who suggested turning respondents' actions into a class action. We disagree with this characterization of the discussion. Throughout the hearings, the trial court repeatedly commented that there should have been a class action and referred to the class action option as a "fallback" if a better solution could not be reached. Mr. Hornstein's suggestion to amend his clients' actions into a class action on behalf of all investors was made in the course of this discussion. The trial court reasonably concluded that its ruling adequately preserved the rights of the investors while

23

avoiding the "tremendous amount of litigation" in proceeding as a class action, thereby conferring a net benefit to the investors as a whole.

We conclude the trial court did not abuse its discretion in finding that respondents' efforts conferred a significant benefit on a large group of people and the public.

### F.  Necessity of Private Enforcement

The necessity of private enforcement "factor ' "looks to the adequacy of *public* enforcement and seeks economic equalization of representation in cases where private enforcement is necessary." ' [Citation.]" (*Committee to Defend Reproductive Rights v. A Free Pregnancy Center* (1991) 229 Cal.App.3d 633, 639 (*Committee to Defend Reproductive Rights*).)  "Important factors the trial court should address in determining if the services of the private party were necessary, so as to support that ultimate finding, are these: (1) Did the private party advance significant factual or legal theories adopted by the court, thereby providing a material non de minimis contribution to its judgment, which were nonduplicative of those advanced by the governmental entity?  (2) Did the private party produce substantial evidence significantly contributing to the court's judgment which was not produced by the governmental entity, and which was neither duplicative of nor merely cumulative to the evidence produced by the governmental entity?" (*Id.* at pp. 642–643, fn. omitted.)

Appellants argue that respondents' special appearance was not necessary because the DBO had already sued to stop the CSL violations, obtained a preliminary injunction, and negotiated the settlement and appointment of the special master.  However, the necessity element is not lacking simply because a private party and public entity co-litigate against a common private defendant.  (See *Committee to Defend Reproductive Rights*, *supra*, 229 Cal.App.3d at p. 645.)  The trial court believed the settlement terms negotiated by the DBO were insufficient to protect the investors' rights and interests, and the issues brought to light by respondents in their special appearance eventually led to changes in the negotiated settlement and management of the underlying properties that, from the trial court's standpoint, added beneficial protections for the investors.  Thus, the record supports the finding that respondents advanced significant factual and legal

24

theories that were adopted by the court and provided a material, non de minimis contribution to the final ruling. (*Id.* at p. 642.) These services were not "duplicative, unnecessary, [or] valueless" (*id.* at pp. 643), and the trial court expressly stated that respondents' special appearance was necessary to achieve these results. We see no abuse here.

### G. Financial Burden of Private Enforcement

" ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]" (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215 (*Whitley*).)[5] " ' "Code of Civil Procedure section 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation." ' " (*Whitley, supra*, 50 Cal.4th at p. 1221.) However, "[w]hen each of the [section 1021.5] criteria is met, the fact the primary effect of the

---

[5] In *Whitley*, the Supreme Court discussed "[t]he method for weighing costs and benefits … illustrated in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Los Angeles Police Protective League*)" which involves fixing the monetary value of the benefits "actually attained" by the successful litigants, discounting this amount by an estimate of the probability of success, and comparing the estimated value of the case to the actual costs of litigation. (*Whitley, supra*, 50 Cal.4th at pp. 1215–1216.) However, "Courts of Appeal have interpreted *Whitley* differently as to whether this test is required in every instance[.]" (*Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376, 391, fn. 11 (*Heron Bay*); see *Summit Media, LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 192 (*Summit Media*) [rejecting arguments that *Los Angeles Police Protective League* test applies in every case and that absence of monetary award equates to zero financial benefits].) Given the unique procedural posture of the instant case, we will not apply the *Los Angeles Police Protective League* test and will look to other case authorities examining financial incentives in the absence of a monetary award.

action was to vindicate a plaintiff's personal economic interests does not foreclose an award of attorney fees." (*Robinson*, *supra*, 202 Cal.App.4th at p. 400.)

The trial court concluded that the attorney fee award of $149,500 was justified because the financial burden of private enforcement would have prevented intervention by respondents and other investors. Implied in this conclusion is the finding that the litigation costs transcended any personal interests or financial incentives that respondents may have had in specially appearing.

On appeal, appellants argue that respondents were not entitled to section 1021.5 attorney fees because any benefit they achieved for other investors was merely coincidental to their expected personal monetary gain in their individual actions (i.e., $475,000 in compensatory damages,[6] punitive damages, treble damages, disgorgement, and conversion value of real property). Respondents counter that they had no immediate monetary gain to achieve from opposing the motion to modify and were forced to move defensively in a case separate from their own to oppose a motion which sought to deny all investors the right to sue the promoters.

The absence of a monetary award is not, by itself, dispositive of whether there is a sufficient financial incentive to justify litigation in economic terms. This principle was illustrated in *Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759 (*Millview*), a decision from Division One of this court. In *Millview*, three plaintiffs successfully challenged a cease and desist order (CDO) issued by the State Water Resources Control Board (the Board) that would have severely restricted diversion under a water rights claim. Two of the plaintiffs (Hill and Gomes) had sold the water rights claim to the third plaintiff, Millview County Water District (Millview), for $2.1 million, but the final purchase price above a $500,000 down payment was contingent upon the outcome of proceedings challenging the CDO, with reductions in Millview's diversion resulting in corresponding reductions to the purchase price.

---

[6] This figure is based on allegations in respondents' complaints that Agasaveeran purchased securities in the total amount of $375,000, and Bryant purchased securities in the amount of $100,000.

(*Millview*, *supra*, 4 Cal.App.5th at p. 764.)  The *Millview* court reversed the award of attorney fees to the plaintiffs, finding they had sufficient financial incentives to justify their challenge to the CDO.  (*Id.* at pp. 767–769.)

Specifically as to Hill and Gomes, the *Millview* court held their financial incentive was "unmistakable" because "[i]f the proposed CDO was endorsed by the Board, they would be limited to retaining the down payment under the purchase agreement, forfeiting the portion of the purchase price that was due if no governmental order was entered limiting diversion under the [water rights] claim. . . . Defeating entry of the proposed CDO had the potential to earn them as much as an additional $1.6 million under the purchase agreement." (*Millview*, *supra*, 4 Cal.App.5th at p. 769.)  As for Millview, the court held that if the CDO was entered severely curtailing its diversion, the water rights claim it had paid $500,000 for "would be rendered worthless." (*Id.* at p. 770.)  The court also observed that the ability to divert water was "plainly valuable" to Millview because it was willing to pay $2.1 million for the claim and hoped to gain the ability to provide independent water service to customers on a waiting list, as well as a supply of " 'free' " water once the purchase costs of the claim were depreciated.  (*Ibid*.)

*Millview* relied on *Summit Media*, *supra*, 240 Cal.App.4th 171 as controlling authority.  In that case, an outdoor advertising company successfully challenged a settlement agreement between the city and two other outdoor advertising companies that exempted the settling companies from a municipal ban on alterations to existing billboards, allowing them to convert their billboards to digital displays.  On appeal from the trial court's denial of section 1021.5 attorney fees, the plaintiff argued that the financial burden criterion was met because it sought and obtained no monetary damages. The court rejected this argument, citing declarations, deposition testimony, and pleadings in which the plaintiff's owner repeatedly referred to the financial injury his business would continue to suffer due to the lack of fair competition caused by the settlement agreement.  (*Summit Media*, *supra*, 240 Cal.App.4th at pp. 188–190.)  The court held that the absence of a monetary award did not prevent the trial court from considering the plaintiff's other financial incentives, and "[t]he record support[ed] the trial court's

27

conclusion that plaintiff had a personal financial stake in this litigation that was sufficient to warrant its decision to incur significant attorney fees and costs in the vigorous prosecution of this lawsuit." (*Id.* at pp. 193–194.)

In *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106 (*Beach Colony II*), a real estate development partnership brought an administrative mandamus proceeding to void a permit condition issued by the coastal commission that would have increased the partnership's costs to build condominium units by $300,000. The appellate court reversed the award of attorney fees to the partnership, finding the partnership made "no attempt to compare its litigation costs to the immediate economic benefit it personally received from judicially establishing its right to restore its property, or to the commercial economic gain it anticipates from the renewed ability to build its housing development." (*Id*. at p. 113.) The court further held that that "the benefits [the partnership] obtained [were] immediately and directly translated into monetary terms" due to the savings in construction costs. (*Ibid.*)

In these cases, the prevailing plaintiffs had sufficient financial incentives to warrant their decisions to incur litigation costs, despite the absence of a monetary award, because the failure to litigate would have resulted in losses of money or value to their assets or investments. The instant matter is distinguishable. Respondents did not avoid any loss of money or value to their assets or investments by specially appearing in the DBO action, and there were no benefits that "immediately and directly translated into" economic terms for respondents as a result of their success. (*Beach Colony II*, *supra*, 166 Cal.App.3d at p. 113.) Had the interlocutory judgment been modified as requested, the individual actions would have been stayed, but that by itself would not have had any direct financial consequence for respondents.[7]

---

[7] While respondents' special appearance also brought to light concerns that the promoters might loot or mismanage the LLCs, any avoidance of investment loss in this sense was not personal to respondents. As we discussed in section III., E., *ante*, the additional investor protections constituted a significant benefit to all of the investors.

28

Appellants argue that respondents had a financial incentive to oppose the stay because it would have postponed their expected recovery. This is not a disqualifying interest for purposes of section 1021.5. Where personal benefits are a step removed from the results of the litigation, the potential financial benefit is indirect and speculative, and thus, a trial court does not abuse its discretion in concluding that the financial burden criterion is satisfied for purposes of section 1021.5. (See *Heron Bay*, *supra*, 19 Cal.App.5th at pp. 394–395, citing *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 740.)

In *Heron Bay*, a homeowners association (HOA) and its members successfully challenged the City of San Leandro's decision to allow a wind turbine maker (Halus Power) to construct a wind turbine on its property. In affirming the award of section 1021.5 attorney fees, a different panel of this court held that the plaintiffs were not disqualified from the award despite their pecuniary interest in preserving property values. The court found that the plaintiffs "neither expected nor received any direct pecuniary benefit from their litigation" and "[a]ny benefit they received in the form of avoiding a loss in property values was at least once removed from the results of the litigation, because the trial court's ruling did not guarantee San Leandro would refuse the requested variance or require Halus Power to make changes to the project following adoption of an [environmental impact report], or that Halus Power would abandon the project. The amount of any monetary advantage, therefore, was speculative." (*Heron Bay*, *supra*, 19 Cal.App.5th at p. 395, fn. omitted.)

Likewise, respondents neither expected nor received any direct pecuniary benefit from their special appearance, and any anticipated recovery in their individual actions is still at least once removed, because the trial court's ruling on the motion to modify did not guarantee them any future recovery. Respondents must still prevail on the merits in their individual actions in order to obtain the pecuniary benefits sought in their complaints. Thus, the amount or value of any personal benefit to respondents is speculative. Respondents are not "cut off from the benefits of section 1021.5 because

29

they pursued litigation that ' "might someday help them . . . secure their [financial] interests." ' [Citations.]" (*Heron Bay*, *supra*, 19 Cal.App.5th at p. 395.)

Accordingly, we conclude the trial court did not abuse its discretion in finding that respondents satisfied the financial burden criterion of section 1021.5.

## H. Corporations Code Section 25530, Subdivision (a) Does Not Immunize the DBO from an Award of Attorney Fees

The DBO argues it is immune from an award of attorney fees under Corporations Code section 25530, subdivision (a). This statute provides in relevant part: "No action at law or in equity may be maintained by any party against the commissioner, or a receiver, monitor, conservator, or other designated fiduciary or officer of the court, by reason of their exercising these powers or performing these duties pursuant to the order of, or with the approval of, the superior court." (Corp. Code, § 25530, subd. (a).) Based on the statute's plain language, however, we find it simply does not apply to the instant matter because respondents did not maintain an action against the DBO.[8]

## IV.    DISPOSITION

The order awarding respondents attorney fees is affirmed. Respondents shall recover their costs on appeal.

---

[8] Because we find the statute's language to be unambiguous, we deny respondents' request for judicial notice of various materials pertaining to the legislative history of Corporations Code section 25530 as not relevant to a material issue in this case. (*Moraga-Orinda Fire Protection Dist. v. Weir* (2004) 115 Cal.App.4th 477, 482, fn. 4.)

30

_____
REARDON, J.

We concur:


_____
STREETER, ACTING P. J.


_____
SCHULMAN, J.*


*Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A143406 & A143307 *People v. Investco Mgmt.*

| | |
|---|---|
| Trial Court: | San Francisco City & County Superior Court |
| Trial Judge: | Hon. Ernest H. Goldsmith |
| Counsel for Appellant: | Holman & Martin<br>A Russell Martin |
| | Mary Ann Smith<br>Deputy Commissioner<br>Douglas M. Gooding<br>Assistant Chief Counsel<br>Edward Kelly Shinnick<br>Senior Counsel<br>Danielle A. Stoumbor |
| Counsel for Respondents: | Hornstein Law<br>Val D. Hornstein<br>Matthew R. Harrison |
| | Timothy F. Perry |

A143406 & A143307 *People v. Investco Management & Development*